**J.B. STONER, Petitioner-Appellant,**

v.

**Charles GRADDICK, Attorney General of Alabama; and Freddie Smith, Commissioner of the Alabama Department of Corrections, Respondents-Appellees.**

**No. 83–7535.**

United States Court of Appeals, Eleventh Circuit.

Jan. 16, 1985.

L.C. Chrietzberg, Decatur, Ga., for petitioner-appellant.

Joseph G.L. Marston, III, Asst. Atty. Gen., Montgomery, Ala., for respondents-appellees.

Before KRAVITCH, HATCHETT and ANDERSON, Circuit Judges.

PER CURIAM:

J.B. Stoner appeals an order of the United States District Court for the Middle District of Alabama denying his petition for writ of habeas corpus under 28 U.S. C.A. § 2254 (West 1977).

On June 29, 1958, a bomb exploded near the Bethel Baptist Church in a residential area of Birmingham, Alabama. The bomb damaged the church and nearby residences, but caused no injuries. In September, 1977, over 19 years later, the State of Alabama extradicted Stoner from Georgia and indicted him for unlawfully setting off or exploding dynamite dangerously near a dwelling house. In 1980, Stoner was tried by a jury, found guilty, and sentenced to 10 years imprisonment. Stoner appealed his conviction to the Alabama Court of Criminal Appeals, which affirmed. *Stoner v. State*, 418 So.2d 171 (Ala.Crim.App.1982). The Alabama and United States Supreme Courts denied certiorari. *Stoner v. State*, 418 So.2d 171 (Ala.Crim.App.), *cert. denied*, 418 So.2d 184 (Ala.1982), *cert. denied*, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983).

Stoner then filed this petition for writ of habeas corpus on June 2, 1983. The district court denied the petition in a written order dated September 15, 1983. Record, Vol. 5 at 1061. On appeal, Stoner claims that (1) he was prejudiced by pre-indictment delay, (2) there was insufficient evidence to support his conviction, (3) prosecutorial misconduct requires reversal, and (4) the statute of limitations was unconstitutionally applied to his case. We affirm.

## FACTS

Stoner was convicted principally on the basis of testimony of Lt. Tom Cook, a retired Birmingham police officer. We summarize his testimony as follows. On direct examination, Cook testified that he met with Stoner in Birmingham on June 21, 1958, approximately a week before the bombing. Also present were Birmingham police captain G.L. Pattie and police informer Hugh Morris. Cook and Pattie were working undercover under the direction of Police Commissioner "Bull" Connor. The police detectives told Stoner that they were Birmingham steel workers interested in the white supremacy movement. Captain Pattie told Stoner that he and Cook were interested in arranging a bombing similar to an attempted bombing of a Jewish Synagogue in Birmingham the previous April. Pattie emphasized that they wanted the bombing to be successful, unlike the Synagogue bombing, which had been a "dud."

Cook testified that Stoner responded that he had some "boys" who were experts in bombing. Stoner said he could handle any type of bombing for $2,000. The police detectives and Stoner discussed several possible targets for a bombing, including the Bethel Baptist Church. Stoner said he was familiar with the location and layout of the church, and had been by to see it.[1] He also said his "boys" already had a bomb made up. Stoner described the bomb. No agreement was made to bomb the church or any other target, however. The meeting ended when Cook told Stoner that if they were able to raise $2,000 and decide on a target, they would notify him.

Cook further testified that eight days later on June 29, 1958, the Bethel Baptist Church was bombed. On July 12, 1958, Cook, Pattie, Morris, and Stoner met a second time in Birmingham. Cook testified that Stoner opened the meeting by declaring that his "boys" had done the job and wanted their money. Pattie and Cook responded that they had not agreed to bomb

the church, had not raised any money to bomb the church, and in fact did not believe Stoner was responsible for the bombing. The officers suggested that the church members themselves had set off the bomb to gain sympathy. Stoner replied that "we four know they didn't do it and the blacks know they didn't do it." Record, Vol. 3 at 623. Stoner explained that because Cook and Pattie had been concerned about getting someone who could do a good job, he had decided to go ahead and show them the type of job he and his "boys" could do. Stoner said he had not been at the church himself but that his "boys" had come back to Georgia, where Stoner lived, and told him what had happened. Cook testified that Stoner accurately described where the bomb had been placed and the type of bomb used. The description of the bomb used matched Stoner's earlier description of the bomb his "boys" had assembled.

Cook testified that Stoner then asked Cook and Pattie to give him at least half of the $2,000. Stoner said he would do another bombing for the other half. Cook and Pattie refused because they had no money and had not authorized the bombing.

On cross-examination, Cook testified that the elimination of Bethel Church's pastor, Reverend Fred Shuttlesworth, had been discussed at the first meeting. He also testified that Pattie and Cook told Stoner at the first meeting that they hoped for a total destruction of the church. Cook also admitted that before Stoner said anything at the second meeting, Pattie told Stoner that Stoner had put Pattie and Cook in a "bad position" by bombing the church: Pattie told Stoner that Pattie's "contacts" thought that Pattie and Cook were trying to rook them out of $2,000, and that Pattie's contacts thought the members of the church had bombed it themselves. Cook also testified that after the second meeting Stoner never again asked for money for the bombing.

---

1. This portion of Cook's testimony was corroborated by C.S. Johnson, a member of the Bethel Baptist Church. Johnson testified that he saw Stoner at the church on one occasion during the month before the bombing. Record, Vol. 3 at 550–52.

Stoner's testimony presented a different version of events. Stoner testified that in June 1958 Hugh Morris came to Georgia, where Stoner lived, and asked Stoner to bomb the Bethel Baptist Church in Birmingham. Morris purported to be representing a group in Birmingham that would pay for the bombing. Shortly thereafter, Morris came to Georgia a second time and asked Stoner to come to Alabama to discuss the bombing. Stoner testified that he went to Montgomery soon after that for a different purpose. In Montgomery, Morris again approached Stoner and asked him to accompany Morris to Birmingham to meet with two men who had money to pay for a bombing. Stoner agreed to go and met with Cook, Pattie, and Morris in Birmingham. Stoner testified that Cook and Pattie told him they wanted Reverend Shuttlesworth's church bombed. If that failed to drive Shuttlesworth out of Alabama, they wanted Shuttlesworth eliminated. Stoner testified that Cook and Pattie told him that they would contact him when they had money for the bombing.

Stoner testified that after the meeting Hugh Morris drove him by the Bethel Church. Stoner said that was the first time he had seen the church. Stoner also said that he had driven by the church on the eve of trial in 1980 and that it did not appear to be the same church Hugh Morris had driven him by in 1958.

Stoner further testified that several weeks after the first meeting with Cook and Pattie, Morris called him and asked him to come to Birmingham again to speak with Cook and Pattie. Stoner drove over to Birmingham from his home in Georgia accompanied by a friend, Richard Bowling. In Birmingham, Stoner again met with Cook, Pattie, and Morris. Stoner testified that at the second meeting, Cook, Pattie, and Morris first told Stoner that black church members had themselves bombed the church. Morris then told Stoner that the Birmingham police had furnished Morris with a black informant, who Morris had paid $500 to bomb the church. Stoner testified that at this second meeting, Cook and Pattie discussed paying Stoner $5,000 to

$10,000 to assassinate Reverend Shuttlesworth. No agreement was reached, however, and Stoner was never paid any money.

Stoner testified that shortly after the second meeting, he and Richard Bowling met with Hugh Morris. At that time, Bowling accused Morris of trying to entrap Stoner. Stoner testified that he also knew that Morris was trying to entrap him, because of his beliefs in white supremacy and segregation. Stoner testified that he met with Morris, Cook and Pattie in order to expose their efforts to entrap him. Stoner testified that he had in fact exposed their efforts in speeches before white organizations throughout the South ever since, but offered no specific evidence to that effect. Stoner denied having anything to do with the bombing of the Bethel Church.

Finally, Stoner testified that he had never advocated violence, publicly or privately, against any segment of society. Rather, he said, he advocated legal and political action to further his goal of white supremacy.

On cross-examination, Stoner denied telling Cook and Pattie that he could arrange a bombing. He denied making, at the first meeting with Cook and Pattie, any of the incriminating statements attributed to him by Cook. Stoner testified that at the first meeting he was aware that Cook, Pattie and Morris were undercover agents. Stoner said that he thought

> they were trying to get me to bomb [the church] on account of my views and then prosecute me and accomplish two objectives but they became more interested in having Shuttlesworth killed and I saw that as an effort to destroy Reverend Shuttlesworth and send me to the electric chair so they could call the case closed and say what a good job they had done.

Record, Vol. 4 at 762. Stoner testified that he did not report this plot to any law enforcement authorities because all such authorities cooperate with each other.

Stoner further denied taking responsibility at the second meeting for the bombing. He also denied demanding payment. He did admit that he intended to take' the $2,000 from Cook and Pattie even though he had not arranged the bombing. His motive was to get even with them for try-ing to entrap him. Stoner said that "Hugh Morris tried to collect it [the money] for me." Record, Vol. 4 at 771. Stoner explained that Morris told Stoner prior to the second meeting that Cook and Pattie were willing to pay Stoner despite his not having arranged the bombing, to encourage him to kill Reverend Shuttlesworth.[2]

Also, on cross-examination, Stoner amended his prior answer on direct examination by saying he never advocated "any illegal violence" against any segment of society. Record, Vol. 3 at 740. He admitted that if his political party were to win power it would be legal to kill Jews because being a Jew would be a crime punishable by death. Stoner also stated that "he may have" stated to an *Atlanta Constitution* reporter in 1977 that "I wish back in '64 that we not only stomped the Niggers in the streets in St. Augustine, but I wish we had run them clean out of the country." Record, Vol. 4 at 751. Stoner also admitted to many other prior statements and beliefs indicating hatred and hostility toward Jews and blacks.

Stoner's version of events was corroborated in part by the testimony of John Robert Stallworth. Stallworth, a retired school teacher, testified that he met Stoner in 1957, but was not Stoner's friend and did not like Stoner. Stallworth testified that in June and July of 1958 Stoner told Stallworth that Ted Cook, Hugh Morris, and a man named Pattie or Petty were trying to trap Stoner. Stoner told Stallworth that he was going to get even for what they were trying to do to him by getting some money

for nothing. Stoner also told Stallworth that Hugh Morris was working for the police. Stallworth testified that he did not believe Stoner had arranged the bombing.

## I. PRE–INDICTMENT DELAY

Stoner argues that the 19-year delay between the crime and his indictment violated his Fourteenth Amendment due process rights. The people of Alabama, through their elected representatives, decided that those guilty of bombing churches and committing other capital offenses would be punished even 19 years after the commission of the crimes. Alabama law, as expressed through the statute of limitations in force at the time of the bombing of the Bethel Baptist Church, provides for the prosecution at issue in this case. When the statute of limitations is constitutional, the Constitution places a very heavy burden on a defendant to show that pre-indictment delay has offended due process.

The statute of limitations is the principal device, created by the people of a state through their legislature, to protect against prejudice arising from a lapse of time between the commission of a crime and an indictment or arrest. *United States v. Harrington*, 543 F.2d 1151 (5th Cir.1976);[3] *United States v. Zane*, 489 F.2d 269, 270 n. 1 (5th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). Statutes of limitation "represent legislative assessments of relative interest of the state and the defendant in administering and receiving justice." *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). Limitations statutes, however, are not the only available protection against prejudice. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52

---

2. "Hugh Morris was the one who asked for the money for me and he told me that they were going to pay me the money even though I did not do it. That was for the purpose of trying to start me on the road to having Reverend Shuttlesworth killed." Record, Vol. 4 at 772–73 (testimony of J.B. Stoner).

3. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

L.Ed.2d 752 (1977). The particular provisions of the Speedy Trial Clause of the Sixth Amendment are available with respect to prejudicial delay after formal indictment or information, or actual arrest. *Lovasco*, 431 U.S. at 788, 97 S.Ct. at 2047; *Marion*, 404 U.S. at 313–22, 92 S.Ct. at 459–64; *cf.* Fed.R.Crim.P. 48(b). However, the Speedy Trial Clause is inapplicable where, as here, the delay concerns a period of time prior to indictment, information, or arrest.

■ Where the possibility of prejudice derives from pre-indictment delay, the defendant in a criminal case must first resort to the applicable statute of limitations. *Id.* at 323, 92 S.Ct. at 464. Only where the applicable statute of limitations has failed to offer relief for pre-indictment delay, are claims of actual prejudice in violation of Due Process Clause of the Fourteenth Amendment ripe for judicial consideration. The Supreme Court has declared, however, that the "Due Process Clause has a limited role to play" in protecting against the prejudice of pre-indictment delay. *Lovasco*, 431 U.S. at 789, 97 S.Ct. at 2048. *See also Marion*, 404 U.S. at 320, 92 S.Ct. at 463; *United States v. Harrington*, 543 F.2d 1151 (absent showing of substantial prejudice amounting to Fifth Amendment due process violation, prosecution is controlled by statute of limitations); *United States v. Sample*, 565 F.Supp. 1166, 1174 (E.D.Va. 1983) (statute of limitations is a legislatively determined safeguard against potential prejudice while due process is safeguard against actual prejudice).

*Marion, supra,* and *Lovasco, supra,* establish the outlines of the due process analysis to be applied by courts in pre-indictment delay cases. In *Marion,* where defendants claimed *potential prejudice* from the passage of time between the commission of the crime and the indictment, the court noted:

*[W]e perhaps need go no further to dispose of this case, for the indictment was the first official act designating appellees as accused individuals and that event occurred within the statute of limitations.* Nevertheless since a criminal trial is the likely consequence of our judgment and since appellees may claim actual prejudice to their defense, it is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. Thus the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused *substantial* prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.... However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution.

*Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465 (emphasis added) (footnotes omitted). Thus, the Court indicated that a due process violation based on pre-indictment delay would have occurred if a showing of *substantial* prejudice had arisen out of a delay intentionally fostered to give the prosecution a tactical advantage. In *Lovasco,* however, the Supreme Court expressly declined, as it had declined in *Marion,* to identify the constitutional significance of the various reasons for delay. *Lovasco,* 431 U.S. at 797, 97 S.Ct. at 2052. Nevertheless, the Court also declined to promote a rule which would require prosecutors to bring an indictment immediately upon receipt of sufficient evidence. In this regard, the Court noted that delay occasioned by good faith investigation is fundamentally different from delay designed to gain tactical advantage. *Id.* at 795, 97 S.Ct. at 2051.

While it is clear under *Lovasco* and *Marion* that a showing of substantial prejudice by the defendant is necessary to a successful pre-indictment delay due process challenge, the Supreme Court stopped short of expressly *requiring* any additional showing that the delay had arisen from a bad faith motivation by the state to gain tacti-

cal prosecutorial advantage. Nevertheless, *Lovasco* implied that something akin to an improper prosecutorial motive would ordinarily be required. In *Lovasco*, the court of appeals had found that the government's delay, based on "a hope ... that others might be discovered who may have participated in the theft," *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048, *quoting* 532 F.2d 59, 61 (8th Cir.1976), was unjustifiable and, thus, violated due process. The Supreme Court reversed, stating that

> [T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." *Rochin v. California*, 342 U.S. 165, 170, 96 L.Ed. 183, 72 S.Ct. 205, 25 ALR2d 1396 (1952). Our task is more circumscribed. We are to determine only whether the action complained of—here, compelling respondent

to stand trial after the Government delayed indictment to investigate further— violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," ... and which define "the community's sense of fair play and decency," *Rochin v. California, supra,* at 173 [72 S.Ct. at 210]....

*Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048 (citations omitted). By stating that the governmental delay must violate "the community's sense of fair play and decency," the Court strongly hinted that bad faith was a necessary component of a successful due process challenge. Indeed, this circuit has so interpreted *Marion* and *Lovasco*. The thrust of binding precedent in this circuit requires the defendant to show both actual prejudice *and* deliberate prosecutorial delay to gain tactical advantage.[4] *See e.g., United States v. Puett*, 735 F.2d 1331, 1334–35 (11th Cir.1984); *United States v. Corbin*, 734 F.2d 643, 647 (11th Cir.1984); *United States v. Jorge-Salon*, 734 F.2d 789, 791 (11th Cir.1984); *United States v.*

---

4. There is, however, some authority which formulates a different due process test. In the *United States v. Brand*, 556 F.2d 1312, 1317 n. 7 (5th Cir.1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978), the Former Fifth Circuit rejected the notion that the Supreme Court precedent requires the defendant to show both actual prejudice and intentional tactical delay in order to support a due process claim. *Brand* interpreted *Lovasco* to require "a sensitive balancing of the government's need for an investigative delay ... against the prejudice asserted by the defendant." *Id.* The *Brand* court found that its analysis was consistent with most of the prior Fifth Circuit precedent, but inconsistent with one case. *Id.* Since *Brand*, however, some Fifth Circuit precedent has required a showing of both prejudice and intentional delay to gain tactical advantage. *See e.g. United States v. Durnin*, 632 F.2d 1297, 1299 (5th Cir. Unit A 1980); *United States v. Parker*, 586 F.2d 422, 430–32 (5th Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979); *United States v. Willis*, 583 F.2d 203, 207 (5th Cir.1978); *see also United States v. Avalos*, 541 F.2d 1100, 1107 & n. 9 (5th Cir.1976) (stating that both actual prejudice and bad faith delay are required, but recognizing that both prongs might not be necessary in extraordinary cases), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977). *But see United States v.*

*Medina-Arellano*, 569 F.2d 349, 353 (5th Cir. 1978) (*Brand*-type balancing approach). Recently, however, the new Fifth Circuit has held unequivocally that balancing is the proper approach. *United States v. Townley*, 665 F.2d 579, 582 (5th Cir.) ("the *Lovasco* balancing test would be reduced to mere words, if indeed the government's 41-month delay in bringing the indictment were excusable, whatever the prejudice caused the defendant, simply by a showing that the government was negligent, however grossly, and not bad-intentioned"), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). In addition, one case in the Eleventh Circuit has interpreted *Lovasco* to require (1) actual prejudice and (2) that the delay was *unreasonable. United States v. Solomon*, 686 F.2d 863, 871 (11th Cir.1982). While acknowledging former Fifth Circuit case law requiring both actual prejudice and deliberate delay to gain tactical advantage, the *Solomon* court cited the *Brand* balancing approach with apparent approval. *Id.* at 871–72. *See also United States v. Lindstrom*, 698 F.2d 1154, 1157–59 (11th Cir. 1983) (citing and explaining the *Brand* balancing approach, but nonetheless stating that due process requires dismissal of indictment if actual prejudice and bad faith are shown; holding that defendants did not show that delay was deliberate tactical maneuver).

*Sanchez,* 722 F.2d 1501, 1509 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Pullen,* 721 F.2d 788, 791 (11th Cir.1983); *United States v. Radue,* 707 F.2d 493, 495–96 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 281, 78 L.Ed.2d 259 (1983); *United States v. Mills,* 704 F.2d 1553, 1556–57 (11th Cir.1983); *United States v. Lindstrom,* 698 F.2d 1154, 1157–59 (11th Cir. 1983); *United States v. Nixon,* 634 F.2d 306, 310 (5th Cir. Jan. 16, 1981), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *United States v. Durnin,* 632 F.2d 1297, 1299 (5th Cir. Unit A 1980).

■ Because Stoner has not carried the burden of proving intentional delay for tactical advantage, his due process claim must fail. Stoner made no showing whatsoever that the state delayed in order to gain a tactical advantage. It is clear from the record that the delay was not investigative. At trial, Cook testified that the last fruitful investigation in this case was the second meeting between Cook, Pattie, Morris, and Stoner in July 1958. Record, vol. 3 at 668. Cook did not know why the prosecution was delayed for 19 years. *Id.* The state trial court held a post-trial hearing to determine the reasons for the delay. The two prosecutors in the case testified that the evidence offered by the State of Alabama was the same evidence that the state

had in its possession on July 14, 1958. Neither prosecutor knew of any reason or justification for the 19-year delay. The state trial judge opined that the state must have believed in 1958 that the evidence would not support a prosecution. The trial judge concluded, "I would almost find as a fact for the reason of delay [that] the state did not feel they could successfully prosecute in '58." Record, Vol. 4 at 858.[5] The state trial court's discussion of this issue amounts to a finding of fact that the state did not deliberately delay to gain a tactical advantage. The question of intent or lack thereof is one of fact, *see Pullman-Standard v. Swint,* 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982) (intent to discriminate under Title VII is a question of fact), and, thus, the state court's finding of no intent to gain tactical advantage "shall be presumed to be correct" under 28 U.S.C.A. § 2254(d).[6] Thus, although the state has not proffered a good, detailed reason for the delay (e.g., to further investigate the crime), no bad faith reason existed either.[7] Since controlling precedent makes intent to delay to gain tactical advantage a necessary component of Stoner's due process claim, we affirm the district court's denial of relief on this ground. *But see supra* note 4.

Alternatively, we hold that Stoner was not substantially prejudiced by the delay.[8]

---

**5.** The trial judge rejected the contention that the state deliberately delayed the prosecution because it would have had to try Stoner in front of an all white jury in 1958, in the hope that social conditions and/or jury compositions would change in the future, thus increasing the chance for Stoner's conviction. The federal district court agreed with the state court that there was no deliberate delay by the state to gain a tactical advantage. The district court observed that "[t]he most that can be said is that the Attorney General of Alabama in office in 1958 made a decision not to prosecute and a different Attorney General on viewing substantially the same evidence made a different decision in 1977." Record, Vol. 5 at 1066.

**6.** Under 28 U.S.C.A. § 2254(d), a federal habeas court must presume state findings of fact to be correct unless certain procedural irregularities not present here rendered the fact finding inadequate. However, "the burden ... rest[s] upon

the [habeas] applicant to establish by convincing evidence that the factual determination by the State Court was erroneous." 28 U.S.C.A. § 2254(d). As stated in the text *supra,* Stoner has made no showing whatsoever that the state deliberately delayed to gain a tactical advantage.

**7.** In the words of the state appeals court, "No reason for the delay can be found in the record." *Stoner v. State,* 418 So.2d 171, 181 (Ala.App.), *cert. denied,* 418 So.2d 184 (Ala. 1982), *cert. denied,* 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983).

**8.** Unlike the factual issue of the motive for the prosecutorial delay, the case law has assumed that the issue of prejudice is a mixed question of law and fact. *Cf. Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674, 700 (1984) (question of prejudice in ineffective assistance of counsel context is mixed question of law and fact, not subject to presumption of correctness under 28 U.S.C.A. § 2254(d)).

The standard of prejudice is fairly stringent. *Tiemens v. United States*, 724 F.2d 928, 929 (11th Cir.1984); *United States v. Solomon, supra,* 686 F.2d at 872. "In *Marion,* the Supreme Court made it clear that when pre-indictment delay is asserted, actual prejudice and not merely 'the real possibility of prejudice inherent in any extended delay,'" must be demonstrated. *United States v. McGough,* 510 F.2d 598, 604 (5th Cir.1975), *quoting United States v. Marion,* 404 U.S. at 326, 92 S.Ct. at 466. Although high, the actual prejudice threshold is not insurmountable and has in fact been met in several of our cases. *See United States v. Mills, supra,* 704 F.2d at 1557 (death of key witness); *United States v. Lindstrom, supra,* 698 F.2d at 1158 (death of two witnesses); *United States v. Shaw,* 555 F.2d 1295, 1298–99 (5th Cir.1977) (death of witness, failure of memory, and deteriorating health and financial condition of defendant).

■ In examining Stoner's claim of prejudice, we are mindful that this case involves an extraordinary delay. The Supreme Court cases and cases in this circuit have evaluated prejudice in the context of delays of less than four years. *See, e.g., United States v. Solomon, supra,* 686 F.2d at 871 (42 months). In contrast, the delay here was over 19 years. However, the law in this circuit is that prejudice will not be presumed because of a lengthy delay. *United States v. Willis,* 583 F.2d 203, 208 n. 5 (5th Cir.1978). We would certainly expect that actual prejudice would be more likely in a case such as this than in a case involving significantly less delay. Over a greater period of time witnesses are more likely to die, documents may well disappear or be destroyed, and memories are much more likely to fade. However, the ultimate inquiry in any case is the same: whether substantial prejudice has occurred. If no substantial prejudice is proved, then the guidepost for judging impermissible delay is the Alabama statute of limitations which would, in this case, allow for delay in excess of 19 years.

■ Stoner asserts that this defense was prejudiced by the death of several witnesses. Death of witnesses may support a claim of actual prejudice. *United States v. Mills, supra,* 704 F.2d at 1557; *United States v. Lindstrom, supra,* 698 F.2d at 1158. To prove prejudice from the loss of deceased witnesses' testimony, however, a defendant must make more than a general allegation of loss of witnesses. *United States v. Beckham,* 505 F.2d 1316, 1319 (5th Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104 (1975); *see also United States v. Solomon, supra,* 686 F.2d at 872 ("When a defendant asserts prejudice because of the loss of evidence, he must show that the loss impaired his ability to provide a meaningful defense").

Here, Stoner proffered affidavits stating his belief as to what the deceased witnesses would have testified at trial. In one affidavit, Stoner claimed that Ralph Barron, who died in 1976, would have testified that Stoner told him [Barron] in July 1958 that Hugh Morris was trying to trap Stoner. Stoner alleged that Barron would have testified that Stoner told Barron that he [Stoner] was leading Morris along so that he could expose Morris later. Allegedly, Barron would also have testified that Stoner told him that Morris had found someone else to bomb the Bethel Baptist Church because Stoner would not do it.

Stoner claimed that Richard Bowling, who died in 1973, would also have testified that Stoner knew that Cook, Pattie and Morris were undercover police agents. Bowling would have corroborated Stallworth's and Stoner's testimony that Stoner intended to take Pattie's and Cook's money for nothing. Bowling allegedly would have testified that he accompanied Stoner to Birmingham when Stoner went to meet Pattie, Cook and Morris for the second time, in order to confront Morris, who Bowling knew to be an undercover agent. Bowling allegedly would have testified that after the second meeting between Cook, Pattie, Morris and Stoner, Bowling did confront Morris with this knowledge at which time Morris admitted to Bowling and Stoner

that Morris had paid someone else to bomb the church.

We find that the death of these two witnesses did not cause the substantial prejudice required by *Marion* and *Lovasco*. With respect to the alleged testimony of these two witnesses, the most crucial testimony by far would have been Bowling's testimony that Morris admitted the bombing to Stoner and Bowling following the second meeting.[9] If believed, that testimony would have had the tendency to exonerate Stoner. *See United States v. Lindstrom, supra*, 698 F.2d at 1158 (finding actual prejudice from death of two witnesses who allegedly would have presented significant exculpatory evidence). However, this testimony would *not* have been admissible because of its hearsay character. We are, of course, not free to make findings on the admissibility of evidence in state proceedings; however, the state courts apparently made such a finding of inadmissibility. *See Stoner*, 418 So.2d at 180 ("First of all, much of the alleged testimony is rank hearsay ..."); Transcript of Pre-trial Hearing, Record, Vol. 2 at 431 (trial judge referring to Stoner affidavit re Bowling testimony: "I mean a lot of that stuff would be hearsay and would not be admissible if he were here"); Record, Vol. 4 at 825 (holding of the state trial judge: "I will say now at the conclusion of the trial that [concerning] the affidavit of Mr. Bowling that has been presented, I see no place for him in this case that would be admissible").[10]

The hearsay character of the alleged Bowling testimony is particularly significant in this case because it relates to the out of court statements of Hugh Morris. Morris was another "unavailable" witness, who allegedly would have absolved Stoner of guilt by testifying that he ordered the

bombing. Morris was not dead at the time of the trial, and Stoner has not established that Morris' "unavailability" was the result of pre-indictment delay. The state trial transcript indicates that both the state and Stoner served subpoenas on Morris before trial. Record, Vol. 3 at 665. Midway through the state's presentation of evidence, Stoner requested that the trial court issue an attachment order to procure Morris' attendance at trial. The prosecutor then told the trial court that Morris had not yet made an appearance because he had been "in and out seeing the doctor for the last few days for heart trouble in Georgia." *Id.* The trial court thereupon ordered the prosecutor to produce Morris. The trial transcript makes no further mention of Morris. Stoner made no further motion to compel Morris' appearance and has not explained to this court why Morris never appeared. There is no evidence that Morris disappeared during the lengthy pre-indictment delay. Moreover, since the trial, Stoner has given no explanation for his failure to present testimony by Morris. Nor has he presented an affidavit from Morris in the federal habeas proceedings. Stoner's failure to produce Morris is telling. Not only does it undermine the allegation as to what Morris would have said, but the "unavailability" of Morris highlights the wisdom of a policy deeming inadmissible the statements of Bowling as to what Morris would have said. *Cf.* Fed.R.Evid. 804(b)(3) (even if Morris were truly unavailable, see Fed.R.Evid. 804(a), testimony with respect to what Morris said might be inadmissible because "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement").

---

**9.** *See e.g.,* Stoner Affidavit re Bowling Testimony, Record, Vol. 4 at 952 ("Hugh Morris said that he had gotten a 'nigger' to bomb Shuttleworth's church for only $500.00. Hugh Morris claimed that he was the only genuine Imperial Wizard and that he had engineered every bombing that had occurred in Alabama and that only one had turned out to be a dud ... he claimed that everything that he and his associates did

done in regard to Shuttleworth's church was done to convince J.B. Stoner to trust him (Hugh Morris) and his associates").

**10.** It is interesting to note that the alleged statements of Bowling would apparently not be admissible under the Federal Rules of Evidence. See Fed.R.Evid. 804(b)(3).

We are left, then, with the nonhearsay statements[11] of Bowling and Barron as to what Stoner said concerning his [Stoner's] involvement in the meetings and the role Hugh Morris played, if any, in the bombing. Such testimony would not necessarily have been unimportant as it would have corroborated to some extent both Stoner's and Stallworth's testimony. The state argues that most of Barron's and Bowling's testimony in this regard was merely cumulative of the testimony of Stallworth and Stoner. Although corroborating testimony cannot always be discounted as merely cumulative especially where, as here, the outcome hinged upon a credibility choice, we are nevertheless confident that this alleged testimony of Barron and Bowling, which amounts to little more than a recitation of what Stoner "said" to them concerning Hugh Morris' attempt to "trap" Stoner and subvert the white supremacy movement, did not constitute substantial prejudice to Stoner's defense.

Stoner also claims prejudice from the unavailability of two other witnesses who were deceased at the time of trial. They allegedly would have testified that Stoner was not in Birmingham at the time of the bombing. Yet, the state never contended that Stoner was in Birmingham when the bomb exploded. The state's evidence was that Stoner had arranged the bombing, not that he had actually planted the bomb. His whereabouts on the day of the bombing were not in issue. Therefore, the unavailability of these two "alibi" witnesses did not prejudice Stoner's defense.

Similarly, Stoner argues that the 19 year delay prevented him from using expense account and travel records to prove his whereabouts at the time of the explosion. Stoner testified that his former employer, State Farm Insurance Co., had destroyed these records several years earlier. There is a letter from State Farm in the record that confirms this. However, as indicated above, the prosecution never contended that Stoner was present in Birmingham when the bomb exploded. Therefore, the loss of this documentary evidence did not prejudice Stoner's defense.

■ Stoner makes two other arguments with respect to his pre-indictment delay claim which warrant brief discussion. Stoner asserts a general claim that the passage of time dimmed the witnesses' recall. This sort of speculative assertion does not meet the actual prejudice standard. *United States v. Rice*, 550 F.2d 1364, 1369 (5th Cir.), *cert. denied*, 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977); *United States v. McGough, supra*, 510 F.2d at 604 (5th Cir.1973). Stoner also claims that he was unable to remember the names of clients and companions who might have testified about his activities at the time of the explosion. This claim is refuted by Stoner's testimony, which details his activities, his whereabouts, and the company he kept. Although Stoner on a couple of occasions during his testimony stated that he did not remember certain events, no lapse of memory occurred with respect to crucial evidence. In fact, Stoner's recall concerning the meetings with Cook, Pattie, and Morris was remarkably lucid and detailed. His recall concerning his whereabouts and travels on the weekend of the bombing were similarly impressive. Finally, Stoner argues that Cook suffered repeated memory lapses during the trial period. Cook, however, was able to refresh his memory from memoranda prepared by Pattie immediately after the two meetings. This, of course, is a routine way in which witnesses are legally permitted to refresh their memories. Moreover, Stoner impeached Cook's testimony on cross-examination by bringing out these alleged "lapses." Thus, the jury could evaluate any weaknesses in Cook's memory when it weighed his testimony.

■ Viewing the entire sequence of events from 1958 to the present, we hold that the pre-indictment delay did not result

---

11. We assume *arguendo* that such statements are not hearsay, or might have been admissible as exceptions. *Cf.* Fed.R.Evid. 801(d)(1)(B).

in substantial prejudice to Stoner. *Cf. Strickland v. Washington,* —— U.S. ——, ——, 104 S.Ct. 2052, 80 L.Ed.2d 674, 698 (defining prejudice requirement with respect to ineffective assistance of counsel claims: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome").[12]

## II. SUFFICIENCY OF THE EVIDENCE

■ Stoner contends that the evidence was insufficient to sustain his conviction. We can grant habeas relief on this claim only if upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979). We must view the evidence in the light most favorable to the prosecution. *Id.* at 326, 99 S.Ct. at 2792; *Duncan v. Stynchcombe,* 704 F.2d 1213, 1215 (11th Cir.1983).

■ The testimony of Cook was sufficient to allow a rational trier of fact to find Stoner guilty as an aider and abetter under Alabama law. As summarized by the state appeals court, Cook's testimony was that

Appellant offered to bomb the church for a price. Appellant gave a general description of the type of bomb ultimately used. The church was bombed. Appellant correctly described the bombing, and appellant demanded payment.

*Stoner,* 418 So.2d at 183. Stoner's conflicting testimony does not undermine our con-

clusion of sufficiency.[13] A rational fact finder could have credited Cook over Stoner.

## III. ALLEGED PROSECUTORIAL MISCONDUCT

■ Stoner argues that the prosecution improperly injected racial prejudice into the trial by strenuously cross-examining Stoner on his racist views. Stoner claims that the references to his avowed hatred of blacks and Jews created the danger that the jury convicted him because of his views and not because of a belief in his guilt.

On direct examination, Stoner testified that he had never advocated the use of violence towards any segment of society. On cross-examination, the prosecutor asked Stoner whether he had made certain inflammatory statements in the past advocating violence against blacks and Jews. The trial court allowed this line of questioning to impeach Stoner's assertion that he had never advocated violence. Record, Vol. 4 at 753.

Later in the cross-examination, the prosecutor asked a series of questions exploring Stoner's hatred of blacks. The prosecutor asked Stoner about his membership in white racist organizations and about numerous racist statements Stoner had made over the years. The state appeals court found that this questioning was proper to prove motive for the bombing. *Stoner,* 418 So.2d at 183. See *supra* note 13.

We agree that the questions relating to Stoner's past advocacy of violence were proper to impeach Stoner's assertions that he had never advocated violence. Stoner opened the door to this line of questioning.

---

12. In holding that Stoner has not proved actual prejudice, our discussion and reasoning parallels the similar holding of the state appellate court. *Stoner,* 418 So.2d at 180–81. The state court also held, alternatively, that Stoner's proffer in this regard was insufficient because Stoner's affidavits were speculative and self-serving assertions. *Id.* at 180. We need not address this alternative holding of the state court.

13. Moreover, the jury could well have credited the testimony of C.S. Johnson who stated that

he saw Stoner at the church in the month preceding the bombing. In addition, the jury likely discredited Stoner's testimony because of his statement on direct examination that he never advocated violence followed by his admission of some statements on cross-examination advocating violence against and hatred towards Jews and blacks. The jury also may have considered this testimony as tending to prove Stoner's motive for the bombing. *See infra* Part III; *see also Stoner v. State,* 418 So.2d at 183.

We also conclude that the prosecutor's explanation of Stoner's hatred did not impermissibly inject race into the case, *i.e.*, the questions relating to Stoner's racism were proper to prove motive for the bombing of the black church.[14] Such evidentiary rulings are questions of state law which we may not disturb except in extraordinary circumstances not present here. Therefore, we find no prosecutorial misconduct.

## IV. STATUTE OF LIMITATIONS

In 1958, when the bombing in this case took place, the crime of bombing dangerously near a dwelling was a capital offense. It carried an unlimited statute of limitations. Noncapital offenses carried a three year statute of limitations. In 1977, when Stoner was indicted, the crime of bombing near a dwelling was no longer a capital offense. It carried a three year statute of limitations.

Stoner argued in the state courts that the statute of limitations in place at the time of his indictment should apply. The state courts found as a matter of law that the statute of limitations in effect at the time of the crime governs. Stoner contends that this rule of state law violates equal protection because a person committing the same crime today would have the benefit of the three year statute of limitations. We will assume *arguendo* that Stoner states a federal claim.[15] The Alabama Court of Criminal Appeals explained that the reason for the statute of limitations rule, that the statute of limitations in effect at the time of the crime governs, is to prevent the legislature from enlarging the statute of limitations until a particular criminal is tried and sentenced, an application that would be *ex post facto*. *Stoner*, 418 So.2d at 179. Thus, the rule has a rational basis. It thereby survives scrutiny under the Equal Protection Clause. *Searle v. Cohn*, 455 U.S. 404, 408, 102 S.Ct. 1137, 1141, 71 L.Ed.2d 250 (1982) (absent rule based on invidious classification or which impinges on fundamental right, state statute of limitations will be upheld if there exists a rational reason for the rule).

## CONCLUSION

In light of the foregoing, the order of the district court denying Stoner's petition for a writ of habeas corpus is

AFFIRMED.

---

14. Statements made by Stoner since 1958 would be less relevant to motive than statements made before the bombing. Nonetheless, they would still tend to make the existence of a motive of racial hatred more probable than in the absence of the statements. *Cf.* Fed.R.Evid. 401.

15. The district court rejected Stoner's argument as an attempt to federalize a purely state law question, which is not subject to review by a federal habeas court. Record, Vol. 5 at 1065.