[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 19, 2008
THOMAS K. KAHN
CLERK

No. 07-12536
Non-Argument Calendar

_____

D. C. Docket No. 06-20385-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PEDRO HORTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 19, 2008)**

Before TJOFLAT, BLACK and CARNES, Circuit Judges.

PER CURIAM:

This is Pedro Horton's appeal of his convictions for possession of a firearm

by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861.

## I.

Around June 23, 2001, Horton was dealing drugs in North Carolina with a man named Rollie Crawley. Horton and Crawley decided to try to buy two kilograms of cocaine. They spoke to Crawley's brother-in-law, Richard Neil, who directed them to Ian Hunt. Horton and Crawley drove to Miami to buy the cocaine from Hunt. Once there, Crawley, Neil, and another drug associate, Dexter Milton, went to Hunt's house. They decided that they would buy half a kilogram of cocaine, verify that it was good, and then buy the rest. Hunt called an unknown confederate, who came over, took the money, and left the cocaine. When Crawley and Milton checked it, they discovered that it was actually flour. They beat Hunt and forced him into Milton's black Mustang. The four men then drove around trying to find the man who had taken the drug money.

While driving, Milton called someone to tell him that they had been tricked and to "bring some fire." Milton then met up with a man in what Hunt later described as a "gold four-door Chevy." Milton went to the car and returned with a black Tech-9 machine gun. Unable to find Hunt's confederate, Milton, Crawley, Neil, and Hunt returned to Hunt's house. Horton, who was not present during the

2

deal, arrived shortly after them in a gold Nissan Altima. When they arrived back at the house, Crawley and Milton began beating Hunt. Neil decided that things had gotten "out of hand" and left the house. Crawley and Milton then allowed Hunt to use the phone. He called a friend, and the friend called the police to report a robbery in progress at Hunt's home. When the police arrived, Horton and Crawley ran out the back door, and Milton ran out the front. All three were arrested. The police also found Neil and detained him for questioning.

Three cars were parked around the house—a gold Nissan Altima, Milton's black Ford Mustang, and a white van. Officer Cary Sykes, one of the officers who responded to the robbery-in-progress call, looked in the Nissan and saw what appeared to be the butt of a shotgun wrapped in plastic and wedged between the passenger seat and the center console. When the Nissan was searched, this gun turned out to be an unregistered Ruger mini-14 .223 caliber semi-automatic rifle. The following items were also found in the Nissan: (1) Horton's driver's license; (2) a Western Union MoneyGram receipt in Horton's name; (3) a rental car receipt made out to Tameka Griffin and listing Horton as an authorized driver; and (4) a warning citation from almost a month earlier issued to Crawley by the North Carolina Highway Patrol. Neither Horton's DNA nor his fingerprints were found on the Ruger mini-14, but his fingerprint was found on the citation.

3

When the police arrived, Hunt initially gave a false name—"Paul Hunt"—and gave an account of what happened that omitted the cocaine. When the police discovered that Hunt had used a false name, they questioned him further. Hunt then recounted a more complete version of events. Hunt was a Jamaican citizen, and, on October 11, 2001, the government began removal proceedings against him. He was deported on December 20, 2001.

The state of Florida initially investigated this case, but the state attorney's office declined to prosecute Horton. On November 6, 2001—about a month before Hunt was deported—the Bureau of Alcohol, Tobacco, Firearms and Explosives brought the case against Horton to the U.S. Attorney's Office for the Southern District of Florida. On May 31, 2002, the U.S. Attorney's Office closed the case for lack of evidence.

In the course of investigating unrelated crimes possibly committed by Horton, an Assistant U.S. Attorney met with Tyrone Taylor, who provided her with information concerning this case. The investigation was then delayed for nearly a year because the AUSA went on maternity leave. Upon her return in November 2005, she continued investigating. On May 1, 2006, the AUSA met with Neil, who gave her further information on the case. She presented the case to the grand jury, and on June 23, 2006, eleven days before the five-year statute of limitations would

have run, the grand jury returned an indictment against Horton for five gun- and drug-related crimes.

Horton filed a motion to dismiss the indictment based on pre-indictment delay. He argued that the nearly five-year delay in seeking an indictment prejudiced him because during that time Hunt was deported, one potential defense witness died, and another could no longer be found. Before the hearing on Horton's motion to dismiss, the government attempted to find Hunt. Hunt eventually called the government investigator to tell him that he would not return to the United States and would not allow himself to be interviewed about the case. After the hearing on Horton's motion to dismiss, a magistrate judge issued a report and recommendation that the motion be denied, to which Horton objected. The district court overruled the objection and summarily adopted the report and recommendation.

Horton proceeded to trial. The government called Officer Sykes, Crawley, and Neil as witnesses. Cumulatively they testified to the facts recounted above about the day Horton was arrested. Additionally, the government called Taylor, who recounted a meeting he had with Horton shortly after Horton's arrest. Taylor testified that Horton told him that the police had taken his money and his mini-14. Taylor went on to say that he had seen Horton with a mini-14 before, that not all

mini-14s looked alike, and that the mini-14 recovered from the gold Nissan Altima appeared to be Horton's. Finally, the government read into the record stipulations agreed upon by both sides. The list of stipulations included Hunt's post-arrest statement and the absence of fingerprints on the Ruger mini-14.

After the government's case, Horton moved for a judgment of acquittal, which the district court denied. Horton then put on two witnesses. The first, the lab supervisor who tested the Ruger mini-14 for DNA, testified that Horton's DNA was not on any of the parts of the gun most likely to have it. The second, the investigator who spoke with Hunt, testified about the efforts to find Hunt so that he could testify at trial. Horton entered into the record Milton's post arrest statements—the most relevant of which was that Milton denied knowing that Horton had a gun in his car—and then rested his case. Horton again moved for a judgment of acquittal, and the court denied the renewed motion.

Following the closing arguments, Horton requested that the district court include two additional jury instructions. One stated that the jury could conclude that the government deported Hunt because his testimony would hurt the government's case. The other said that the jury could consider the delay in bringing the case when determining Horton's guilt.

The district court declined to charge the jury with those instructions, but did

instruct the jury that it should consider whether the witness had a good recall of the incident in determining whether to believe that witness' testimony. The jury returned a verdict of not guilty on the three drug-related offenses and guilty on the two that related only to Horton possessing the Ruger mini-14—possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861.

Horton now appeals, arguing that the district court erred when it: (1) did not dismiss the indictment on the grounds of pre-indictment delay by the government; (2) declined to give the jury the instructions that Horton requested; and (3) did not grant Horton's motion for acquittal based on insufficiency of the evidence.

## II.

Horton first contends that the district court erred by denying his motion to dismiss the indictment because of delay by the government in obtaining it. We review a district court's decision on a motion to dismiss an indictment because of pre-indictment delay only for abuse of discretion. United States v. Foxman, 87 F.3d 1220, 1222 (11th Cir. 1996). To permit a court to dismiss on that ground, a defendant must show: (1) that the government deliberately delayed to get a tactical advantage and (2) actual substantial prejudice from the delay. Id.

Horton argues that the first prong of the analysis can be met on the ground

that the government acted recklessly by delaying the indictment until after Hunt was deported. However, we have specifically held that recklessness is not sufficient to justify a dismissal based on pre-indictment delay. See Stoner v. Graddick, 751 F.2d 1535, 1543 (11th Cir. 1985). The delay must be intentional and for the purpose of gaining a tactical advantage. Id.

Whether the government acted with the intent to gain a tactical advantage is a question of fact. Id. We review the factual findings of the district court only for clear error. United States v. Barner, 441 F.3d 1310, 1315 (11th Cir. 2006). The magistrate judge heard all of the evidence and found that the government did not act with the requisite intent. The district court then heard Horton's objections and reached the same conclusion. Hunt was deported approximately one month after the government started its investigation. Even if the government believed that Hunt's deportation would improve its case against Horton, it is unclear how its delaying the indictment for four years after Hunt's deportation would further benefit the government. The government's reason for delaying Horton's indictment—it only obtained sufficient evidence to obtain a conviction after speaking with Neil—was not to gain tactical advantage through delay. The Supreme Court has made it clear that "investigative delay is fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the

8

accused." Lovasco, 431 U.S. 783, 795, 97 S. Ct. 2044, 2051 (1977) (quotation marks omitted). The district court did not clearly err in finding that the delay was not intentional for the sake of tactical advantage, and, therefore, Horton failed to meet the first requirement of a dismissal for pre-indictment delay.

## III.

Horton next contends that the district court erred by not giving his requested jury instructions. We review a district court's refusal to give a jury instruction requested by the defense only for abuse of discretion. United States v. Chastain, 198 F.3d 1338, 1350 (11th Cir. 1999). A district court's decision not to give a requested jury instruction will be reversible error only if the defendant shows that the instruction: "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." United States v. Brazel, 102 F.3d 1120, 1139 (11th Cir. 1997) (citation omitted).

Horton's proposed instruction read:

You will remember that the parties presented evidence that Ian Hunt was present when the crime is supposed to have been committed. This may have caused you to wonder why Mr. Hunt was not called as a witness to answer questions in this trial. The Government deported Mr. Hunt in January 2002. If you believe that the government was responsible for his absence, then you may consider his absence when

9

you decide whether the government has proved, beyond a reasonable doubt, that the defendant committed the crimes. In other words, you may conclude that the government did not call Ian Hunt as a witness because his testimony would have hurt the government case.

This is not a correct statement of the law.

We held in United States v. Chapman, 435 F.2d 1245 (5th Cir. 1970),[1] that it is improper for the jury to hold a party's failure to call a witness against that party when the witness is equally unavailable to both sides. Id. at 1247. Hunt was in Jamaica, and thus could not be served with compulsory process by either the government or Horton. Further, when, after a thorough search, the government managed to contact Hunt, he refused to return to the United States and would not discuss the case. He was unavailable to the government as well as Horton, so the government's failure to call Hunt as a witness cannot be held against it. Therefore a jury instruction to the contrary does not correctly state the law, and the refusal to give the requested instruction cannot be reversible error.

The second instruction that Horton requested concerned the pre-indictment delay. Both parties characterize this as a theory of the defense instruction. A district court's decision not to give a theory of the defense instruction will be

---

[1] All decisions from the Fifth Circuit rendered before October 1, 1981 are binding precedent on the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

10

reversible error only if: "(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." United States v. Paradies, 98 F.3d 1266, 1286 (11th Cir. 1996). The requested instruction read: "The events in question in this case allegedly occurred in July 2001. The case was not charged until June 2006. In determining whether or not there is reasonable doubt in this case, you are entitled to take into account this delay."

Assuming that this is a correct statement of the law, the point was substantially covered by an instruction that was given. The district court instructed the jury that it should consider witnesses' recall when deciding whether to believe their testimony. Additionally, Horton's "central theme throughout the trial" was that the pre-indictment delay led to lapses in memory. The jury knew the events had occurred five years before and that memory fades with the passage of time. Because jury instructions are to be considered in the context of the entire oral charge and the events at trial, the requested instruction would not have given any new information or guidance to the jury. The requested theory of the defense instruction was substantially covered by the instructions given, so the district court

11

did not err in declining to give the requested theory of the defense instruction.

**IV.**

Horton's final contention is that there was insufficient evidence to convict him of the firearm possession offenses. We review de novo the sufficiency of the evidence supporting a criminal conviction, but we examine the evidence in the light most favorable to the government and make all inferences and credibility choices in favor of the jury's verdict. United States v. Tinoco, 304 F.3d 1088, 1122 (11th Cir. 2002). The only element of either offense about which Horton argues there is insufficient evidence is the actual or constructive possession of the firearm.

A defendant has actual possession of an object when he has physical possession or actual personal dominion over it. United States v. Derose, 74 F.3d 1177, 1185 (11th Cir. 1996). A defendant has constructive possession of an object when he "has knowledge of the thing possessed coupled with the ability to maintain control over it or reduce it to his physical possession even though he does not have actual personal dominion." Id. (internal citation and quotation marks omitted). He will also have constructive possession if he has "ownership, dominion, or control over the [object] itself or dominion or control over the premises or the vehicle in which the contraband was concealed." Id.

The evidence in the record, viewed in the light most favorable to the government, would allow a reasonable jury to conclude that Horton actually or constructively possessed the firearm. More than one witness testified that Horton had driven the gold Nissan Altima only minutes before the gun was found there. Officer Sykes testified that the Ruger mini-14 was visible from outside the car, so Horton could not have been unaware that it was there. Crawley testified that Horton was the last to arrive at Hunt's house, so the jury could have inferred that no one had an opportunity to put the firearm in the car after he exited the it. These facts alone would allow a jury to conclude that Horton had at least constructive possession of the firearm by virtue of his ability to take actual possession of it or his control over the car where it was located. See United States v. Wright, 392 F.3d 1269, 1273–74 (11th Cir. 2004) (holding that a defendant had constructive possession of a firearm that was in the car that he was driving). Additionally, Taylor's testimony that the Ruger mini-14 found in the Nissan appeared to be one that he had seen Horton with in the past is circumstantial evidence that Horton had possession of it on the day in question. We conclude that based on this evidence a reasonable jury could have found that Horton was guilty beyond a reasonable doubt of possession of a firearm by a convicted felon and possession of an unregistered firearm.

**AFFIRMED.**