******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NATHANIEL FAUST
(AC 37164)

Gruendel, Keller and Borden, Js.

*Argued February 4—officially released November 10, 2015*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J. [motions to consolidate, sever];
Mullarkey, J. [judgment].)

*Mary A. Beattie*, assigned counsel, for the appellant (defendant).

*Jennifer F. Miller*, deputy assistant state's attorney,
with whom, on the brief, were *Matthew C. Gedansky*,
state's attorney, and *Charles Johnson*, assistant state's
attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Nathaniel Faust, appeals from the judgment of conviction, rendered after a jury trial, of one count of conspiracy to commit robbery with a firearm in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4), five counts of kidnapping with a firearm in the first degree in violation of General Statutes § 53a-92a (a), one count of robbery with a firearm in the first degree in violation of General Statutes § 53a-134 (a) (4), and one count of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2), as enhanced by General Statutes § 53-202 (k) for having committed a class A or B felony with a firearm. On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction, (2) the trial court improperly consolidated for trial charges stemming from two separate incidents, (3) the trial court improperly found that the crimes were not signature in nature and that certain evidence was cross admissible in both cases, and (4) the court improperly instructed the jury on the issue of eyewitness identification. We disagree and affirm the judgment of the trial court.

At trial, the defendant was charged with crimes related to two separate criminal endeavors, one in Madison and one in Ellington. The cases were consolidated, over the defendant's objection, and tried sequentially to one jury. The following facts, viewing the evidence in the light most favorable to sustaining the verdict, reasonably could have been found at trial.

### Madison

On July 2, 2008, at approximately 12:30 p.m., two men wearing ski masks, gloves, and black clothing, entered Paul Lirot Jewelers in Madison. At that time, there were five individuals in the store: Paul Lirot, the store owner; Cindy Cochrane and Rose Schroeder, two store employees; Randy Wilkinson, a jewelry appraiser; and John D'Amico, a jewelry salesperson. Cochrane, who was in a hallway when the men entered, saw one of the men approach her, brandishing a black gun. The man pointed the gun at her face and ordered her to enter the store's workroom. Lirot, who was in the workroom at the time, turned around and saw one of the men point a gun at him and yell, "do you want me to shoot you, do you want me to shoot you?"

During this time, D'Amico and Schroeder were sitting at a table in the store's kitchen. One of the masked robbers, who was wearing a yellow hardhat, appeared in the kitchen doorway and demanded that D'Amico and Schroeder move into the store workroom. Once all five individuals were in the workroom, the two robbers ordered them to lie face down on the ground with their hands behind their backs. The robbers then bound the ankles and wrists of Lirot, Cochrane, Schroeder and

D'Amico with duct tape and used novelty handcuffs to secure Lirot to Wilkinson. At one point, Lirot attempted to raise himself onto his elbows and was pepper sprayed by one of the men.

While one of the robbers watched over the individuals, the other went through the store, collecting at least $350,000 worth of jewelry and a small amount of cash. After the perpetrators left, the five individuals freed themselves, activated the store's silent alarm, and went outside to wait for the police.

Upon questioning by the police, Lirot recalled three prior incidents of note. He explained to the police, and later testified at trial, that two weeks prior to the robbery, a tall, thin, unkempt African-American male had entered the jewelry store and requested a replacement battery for his watch. After Lirot replaced the battery, the man refused to pay for it and demanded that Lirot remove the battery. Lirot returned the watch to the man without removing the new battery and the man left the store. Lirot observed the man enter the passenger side of a red sport utility vehicle.

One week prior to the robbery, a heavyset African-American woman entered the store, but did not purchase anything. Lirot observed her leave the store and enter the driver side of a red sport utility vehicle. During the trial, Lirot viewed exhibit 50-M, which was a photograph of a red Nissan Armada sport utility vehicle with custom features and identified it as the vehicle he saw on both occasions.

One day before the robbery, at approximately 5:45 p.m., Lirot, Cochrane, and Schroeder were closing the store for the evening when Lirot's dog began to bark, indicating that someone was outside. Schroeder looked out the window and witnessed an African-American male sitting in a silver Mercedes station wagon that had a Massachusetts license plate. She also witnessed another African-American male, with dreadlocks, who began to approach the store but then turned around and returned to the silver Mercedes. She witnessed him enter the passenger side of the vehicle. Cochrane also looked out of the store's window and noticed that the male sitting in the driver side of the vehicle was wearing a yellow hardhat.

Police later determined that the silver Mercedes station wagon matched the description of a vehicle that, three days prior to the robbery, had been reported as stolen from a parking lot in Longmeadow, Massachusetts. On the day it was stolen, Samantha Edwards, a friend of the vehicle's owner, saw the Mercedes, which she identified by its bumper stickers, parked at a gas station in Longmeadow. Edwards, who was stopped at a stoplight, noticed that an African-American male was in the driver's seat of the vehicle. She later identified the defendant as the driver of the vehicle after the police

showed her a photographic array.

When the station wagon was stolen, it contained the owner's wallet and credit cards. Credit card records showed that, after being stolen, the card was used in a transaction at a gas station in Hartford, indicating that the Mercedes had been driven there. Surveillance video of the gas station showed that the Mercedes entered a lot behind a red Nissan Armada with custom features. A police officer testified that additional surveillance video showed an African-American male, with long dreadlocks, emerge from the vehicle. On the day of the robbery, police recovered the stolen Mercedes from a parking lot in Madison that was approximately one-half mile from Paul Lirot Jewelers and one-eighth of a mile from the interstate highway.

During their investigation, the police recovered DNA evidence from the jewelry store. DNA was obtained from the ends of two pieces of duct tape that were used to detain the jewelry store employees and other individuals. A forensic examiner testified that results of DNA testing concluded that the defendant could not be eliminated as a contributor to the DNA profile found at the scene. The first piece of duct tape contained 6.77 picograms of DNA, the equivalent of one human cell. The expected frequency of individuals who could not be eliminated as a contributor to this DNA profile was one in 504 million people in the African-American population, one in 60 million in the Caucasian population and one in 126 million in the Hispanic population. The second piece of duct tape contained 3.3 picograms of DNA and had an expected frequency of individuals who could not be eliminated as a contributor to this DNA profile of one in 170,000 in the African-American population, one in 28,000 in the Caucasian population, and one in 37,000 in the Hispanic population.

### Ellington

On December 18, 2008, at approximately 7:40 p.m., three friends, Brian Seifel, Patrick McGloin, and Mark Debonee, arrived at the Gold and Diamond Exchange jewelry store in Ellington. McGloin was shopping for a Christmas present for his fiancée. The three friends shopped until approximately 8:30 p.m., and then left through the store's front door. As they proceeded to McGloin's vehicle, they noticed two men standing near the side of the building. The two men were dressed in dark clothing and both wore ski masks. Once seen, the two masked men immediately approached Seifel, McGloin, and Debonee.

One of the masked men approached McGloin, pointing a gun at his neck and demanding that he hand over his shopping bag, wallet, and cell phone. The gunman said that he wanted to see the wallet because he wanted to know where McGloin lived. He then ordered McGloin to get into the driver side of his vehicle. During this

time, the other masked man ordered Seifel and Debonee into the passenger side of the vehicle. Once the three victims were inside, one of the masked men proceeded to use duct tape to bind their hands and feet. The perpetrator also used duct tape to bind Seifel's left leg to McGloin's hands and attempted to use silver novelty handcuffs on Debonee, but was unable to do so. After the victims were bound with duct tape, the perpetrator then placed duct tape over their eyes. McGloin heard one of the men say, "we're not here for you, we're here for [the owner of the Gold and Diamond Exchange]." The perpetrators then closed the vehicle doors.

At approximately 8:30 p.m., Kimberly Coughlin drove her vehicle into the Gold and Diamond Exchange parking lot. Upon entering the parking lot, she looked to her right and saw a parked vehicle. Inside that vehicle she noticed some indiscernible movement. When she looked to her left, she saw a masked and armed man approach her driver's side door, point a gun at her head, and attempt to open her car door. Unable to open the locked door, the man began pounding on the window with his gun. Coughlin then fled the area in her car. She drove into an adjacent parking lot and then out onto Route 83. After driving for a short period of time, she called the Vernon Police Department and then called the Gold and Diamond Exchange. In both phone calls, she explained that there were masked men outside of the jewelry store. By the time the police had arrived at the jewelry store, the perpetrators had fled the scene.

The police collected a bullet, wool mask, and a bag containing novelty handcuffs and keys at the scene. DNA was also collected from the scene. Subsequent testing eliminated the defendant as a contributor to the DNA collected. No vehicle was ever found in connection with the events in Ellington.

Kendall Hooks, one of the state's witnesses, testified about the defendant's involvement in the Ellington robbery. Hooks, who had received a plea deal in connection with his own involvement, testified that the defendant was one of the masked men who intended to rob the jewelry store. According to Hooks, when the three victims exited the store, the defendant approached the victim on the driver's side of their vehicle, ordered him into the vehicle, and then approached Coughlin's vehicle. He also testified that, in preparation for the robbery, Hooks, the defendant, and an individual named Ricky Allen drove to a golf resort in Rhode Island, where the defendant and Allen stole a Volvo, which was unlocked and had the keys inside. Hooks stated that the defendant drove the stolen Volvo to Hartford, where it was later recovered by the police. Hooks testified that the plan was to use the stolen Volvo in the Ellington robbery.

Scott Miller also testified at trial. Miller had pleaded

guilty to one count of accessory to commit robbery in the first degree in connection with the Ellington robbery. He testified that the defendant was not involved in the planning or execution of the Ellington robbery. He stated that the three people involved were Hooks, himself, and a third man named Derond, who was a friend of Hooks.

The two cases were joined and tried sequentially to the same jury. At the conclusion of the joint trials, the jury returned a verdict of guilty on all of the Madison related charges and returned a verdict of not guilty on all of the Ellington related charges. The court, *Mullarkey*, *J.*, then sentenced the defendant to fifty years of incarceration, with a mandatory minimum of twelve years incarceration, and ten years of special parole. This appeal followed.

I

The defendant first claims that there was insufficient evidence to permit the jury to find, beyond a reasonable doubt, that he participated in the robbery, or any conspiracy to commit robbery, of the jewelry store in Madison. Specifically, he argues that the evidence was insufficient to identify him as one of the perpetrators. Further, he contends that the state failed to present sufficient evidence that he conspired with others to commit the crime of robbery. Accordingly, the defendant requests that we direct the trial court to dismiss counts two through nine of the state's substitute information.[1] We are not persuaded.

We begin by acknowledging that to the extent that the defendant's sufficiency claims are unpreserved,[2] he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[3] Our Supreme Court has held that "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. . . . Accordingly, because there is no practical significance . . . for engaging in a *Golding* analysis, we review an unpreserved sufficiency of the evidence claim as though it had been preserved. (Citation omitted; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied,     U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). Accordingly, our review will encompass the sufficiency of the evidence of all of the counts of which the defendant was found guilty.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded

that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We also note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty. . . .

"Moreover, [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Additionally, because the jury has the opportunity to observe the conduct, demeanor and attitude of the witnesses and to gauge their credibility, [i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony. . . . We are also mindful that, once a defendant has been found guilty of the crime charged, a reviewing court conducts its review of all the evidence in the light most favorable to the prosecution. In short, [t]he evidence must be given a construction most favorable to sustaining the jury's verdict. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . We also note that [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 799–801, 877 A.2d 739 (2005). Under this standard of review, we now consider each of the defendant's sufficiency claims.

A

The defendant first claims that the evidence was insufficient to establish, beyond a reasonable doubt, his identity as one of the men in the Madison jewelry store robbery. The defendant claims that the only identification evidence before the jury was two eyewitness identifications prior to the robbery and the DNA samples collected from the scene of the crime. The defendant argues that because both eyewitness identifications failed to place him at the scene during the crime, the state's case was based solely on the DNA evidence. Further, the defendant argues that because there was no evidence directly indicating that his DNA was left on the duct tape at the time the crime took place, it cannot serve as probative evidence that he was involved in the robbery. On this basis, the defendant requests dismissal of the robbery, kidnapping, and related charges. We disagree and conclude that, on the basis of the evidence, a reasonable jury could have properly concluded that the defendant was one of the men involved in the Madison jewelry store robbery.

In considering eyewitness testimony, it is the jury's role as the sole trier of the fact to weigh the conflicting evidence and to determine the credibility of witnesses. Id., 802. "In particular, we have recognized that a view of even a few seconds may be sufficient for a witness to make an identification; see *State* v. *Piskorski*, 177 Conn. 677, 743, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979) (superseded by statute on other grounds); *Williams* v. *Bronson*, 21 Conn. App. 260, 265, 573 A.2d 330 (1990); and that it is for the trier of fact to determine the weight to be given that identification. See *State* v. *Mitchell*, 204 Conn. 187, 202–203, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987)." *State* v. *Morgan*, supra, 274 Conn. 801–802.

Like fingerprint evidence, DNA evidence does not necessarily establish that the defendant was one of the perpetrators of the crime. In cases resting solely on fingerprint evidence, our Supreme Court has held that "a conviction may not stand on fingerprint evidence

alone *unless the prints were found under such circumstances that they could have been impressed only at the time the crime was committed.*" (Emphasis added.) *State* v. *Thorpe*, 188 Conn. 645, 648, 453 A.2d 88 (1982). The jury must consider the evidence in the context of the surrounding facts and circumstances, as well as the conditions in which the evidence was found. The purpose of this inquiry is to determine if the evidence indicates, based on the circumstances, that the fingerprints were impressed during the crime as opposed to some point earlier in time. Id., 649; see also *State* v. *Payne*, 186 Conn. 179, 183–84 and 183 n.3, 440 A.2d 280 (1982) (conviction reversed when no evidence limited impression of defendant's fingerprints to circumstances of crime, as well as evidence that defendant had access to area where prints were found and frequented area prior to crime).

Although "the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining *whether the cumulative effect of all the evidence proves the defendant guilty* of all the elements of the crime charged beyond a reasonable doubt." (Emphasis added; internal quotation marks omitted.) *State* v. *Fairley*, 85 Conn. App. 882, 886, 859 A.2d 605 (2004), cert. denied, 272 Conn. 913, 866 A.2d 1285 (2005). Furthermore, in cases involving circumstantial evidence, "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt . . . ." *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981). Finally, "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Brown*, 144 Conn. App. 547, 553–54, 72 A.3d 1271, cert. denied, 310 Conn. 923, 77 A.3d 141 (2013).

In the present case, we conclude that ample evidence exists for a reasonable jury to have concluded that the defendant was one of the perpetrators in the Madison robbery. Patricia Johannes, a forensic science examiner for the Department of Emergency Services and Public Protection, testified regarding the results of DNA tests conducted on evidence collected from the crime scene. She testified that DNA was collected from the ends of the torn fragments of duct tape used to bind the legs and arms of the victims. Johannes explained that she swabbed the ends because that location was more likely to contain the DNA of the person who handled the duct tape, and may have torn it at the ends, rather than the DNA of the person to whom the duct tape was applied. The location of the DNA on the torn ends of the duct

tape reasonably excludes the hypothesis that the DNA was deposited at a time other than during the perpetration of the crime. She testified that two pieces of duct tape contained a mixture of DNA and that testing confirmed that the defendant "cannot be eliminated as a contributor to the DNA profile . . . ." She explained the expected frequency of these DNA profiles occurring among the African-American population. With regard to the first DNA sample, exhibit 5-1, the expected frequency of African-Americans who could not be eliminated as a contributor was one in 504 million. With regard to the DNA sample, exhibit 5-2, the expected frequency of African-Americans who could not be eliminated was one in 170,000. Thus, the evidence indicated that the defendant had previously handled the duct tape, and, moreover, based on the fact that the DNA was found on the ends of the pieces of duct tape, it would be reasonable for a jury to conclude that the defendant handled the tape during the robbery.

Even if the DNA evidence were not dispositive of the defendant's identity, the jury was permitted to consider it in conjunction with the other evidence presented at trial. See *State* v. *Morgan*, supra, 274 Conn. 805. Specifically, the jury heard the testimony of Edwards and Schroeder, who witnessed the defendant's conduct prior to the robbery. Edwards testified that she saw an African-American male with dreadlocks in the driver's seat of her friend's stolen Mercedes in Longmeadow, Massachusetts, three days prior to the Madison robbery. Edwards testified that she was stopped at a stoplight when she recognized her friend's car in a gas station lot. Edwards recognized her friend's car on the basis of two stickers on the car window. She testified that she had a clear view of the driver and described him as an African-American male with dreadlocks. It struck her as odd that someone other than her friend was driving the car, and she placed a phone call to her friend's home. She was later questioned by the police and was asked to look through a photographic array to see if any of the photographs matched the person she witnessed in the Mercedes. Edwards testified that after carefully reviewing each photograph, she positively identified the defendant as the man she witnessed in the car. She also made an in-court identification of the defendant.

The jury also heard eyewitness testimony from Schroeder, an employee of Paul Lirot Jewelers. Schroeder testified that the night before the Madison robbery, as the store's employees were preparing to close the store, she noticed a silver Mercedes station wagon in the parking lot. Inside the vehicle, she saw an African-American male wearing a bright yellow helmet. She also testified that another African-American male, with dreadlocks, dressed in a black long-sleeved shirt and black pants, approached the store's front door. She testified that she clearly recalled that observation

because the store had few African-American customers, it was odd for her to see a person in a Mercedes wearing a hard hat, and it was rare for customers to come to the store at closing time. She provided an in-court identification of the defendant as the person she witnessed approaching the store the night before the robbery. She also testified that after reviewing a photographic array given to her by the police, she had positively identified the defendant's photograph "[t]he minute I saw it" as the person she witnessed approach the store's front on the night before the robbery.

The defendant contends that none of the state's evidence placed him at the scene of the crime. This argument, however, fails to acknowledge that it is the jury's obligation to view the evidence as a whole and that it may consider all facts proven "in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty . . . beyond a reasonable doubt." *State* v. *Fairley*, supra, 85 Conn. App. 886. Although DNA may be transferred to an object at any time, the jury reasonably could have concluded that, because the samples were taken from the torn ends of the duct tape, the DNA was impressed during the commission of the crime rather than at some other point in time. In addition, even if the DNA evidence was not dispositive of the defendant's identity, the two eyewitness identifications, the presence of a silver Mercedes station wagon in the store parking lot the night before to which the man identified as the defendant returned after approaching the store door, and the recovery of the stolen Mercedes less than one-half mile from Paul Lirot Jewelers add to the cumulative weight of the evidence presented at trial. When viewing the entirety of the evidence, the jury could have reasonably determined that the defendant was one of the perpetrators in the Madison robbery.

B

The defendant also claims that the evidence was insufficient to support his conviction of conspiracy to commit robbery in the first degree. We disagree.

"To establish the crime of conspiracy, the evidence must show that an agreement to engage in conduct constituting a crime had been entered into, that the conspirators intended for the conduct to be performed, and that an overt act in furtherance of the conspiracy followed. General Statutes § 53a-48 (a) . . . ." (Citations omitted.) *State* v. *Mendez*, 154 Conn. App. 271, 276, 105 A.3d 917 (2014). "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citation omitted; internal quotation marks

omitted.) *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005). Given "the secret nature of conspiracies, a conviction is usually based on circumstantial evidence . . . [and] inferred from the conduct of the accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Boykin*, 27 Conn. App. 558, 564–65, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992).

Section 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." The state was thus required to prove that the defendant and another agreed to commit robbery, intended to commit robbery with a firearm and that one of the conspirators committed an overt act in furtherance of the conspiracy. See *State* v. *Palangio*, 115 Conn. App. 355, 362, 973 A.2d 110, cert. denied, 293 Conn. 919, 979 A.2d 492 (2009).

The defendant alleges that the state failed to present evidence establishing an agreement between the parties to rob the Madison jewelry store. We, however, previously determined that the DNA evidence, in combination with other circumstantial evidence, was sufficient to find the defendant guilty of robbery in the first degree. See part I A of this opinion. In addition, the state presented testimonial evidence that established that two men, acting in concert, had participated in the robbery.[4] From this evidence the jury could have reasonably inferred that the defendant had previously agreed with others to engage in the crime. *State* v. *Allan*, 311 Conn. 1, 26, 83 A.3d 326 (2014) ("jury [is] allowed to infer the existence of the requisite agreement . . . from proof of the separate acts of each of them and from the circumstances surrounding the commission of these acts").

The defendant next contends that the evidence was insufficient because the state failed to establish that he owned a gun or had one in his possession. The state, however, in proving conspiracy to commit robbery, was not required to establish that the defendant had possession of the gun. It is sufficient to establish that the "alleged conspirators were knowingly engaged in a mutual plan to do a forbidden act"; *State* v. *Pond*, 138 Conn. App. 228, 235, 50 A.3d 950 (2012), aff'd, 315 Conn. 451, 108 A.3d 1083 (2015); and the defendant's "conduct at the scene can provide the requisite evidence of an agreement." (Internal quotation marks omitted.) Id. In *Pond*, the defendant was charged with conspiracy to commit robbery in the second degree when a coconspirator threatened the victim with a gun and the defendant did not intervene. Id., 235–36. This court held that the defendant's silence when the gun was displayed was

sufficient evidence for a jury to conclude that he acquiesced in the full criminal enterprise. Id., 236. In affirming the decision of this court, our Supreme Court noted that an agreement "need not be overt or formal, and may be established purely by inference." *State* v. *Pond*, 315 Conn. 451, 475, 108 A.3d 1083 (2015). Thus, in the present case, it is immaterial to the conspiracy charge whether the defendant was the gunman in the robbery. He either was the gunman, where his possession of the weapon was indicative of a plan to commit robbery in the first degree, or he was the other perpetrator, who knowingly engaged in the robbery while his companion threatened the victims with a firearm. Furthermore, witnesses testified that, at one point during the robbery, the unarmed robber instructed the robber in the yellow hat to shoot Lirot.

The defendant next argues that the state failed to identify or charge any coconspirator. Although a conspiracy requires that two or more people agree to commit a particular crime; *State* v. *Grullon*, 212 Conn. 195, 199, 562 A.2d 481 (1989); the state is not required to charge each and every coconspirator. See *State* v. *Asberry*, 81 Conn. App. 44, 56, 837 A.2d 885 (Connecticut accepted unilateral approach to conspiracy statute, making it irrelevant to defendant's conviction that state did not charge his coconspirators), cert. denied, 268 Conn. 904, 845 A.2d 408 (2004). Thus, the state's failure to pursue the other parties to the conspiracy does not foreclose the defendant's conviction.

Finally, the defendant argues that the state did not establish that he committed an overt act in furtherance of the crime. Specifically, the defendant argues that the state failed to present any evidence connecting the stolen Mercedes to an agreement to rob the Madison jewelry store. This claim fails for several reasons. First, previously in this opinion we concluded that the evidence was sufficient to support a finding that the defendant was in the store and engaged in a coordinated robbery with another individual. See *State* v. *Pond*, supra, 138 Conn. App. 235. Second, the jury is permitted to draw all reasonable inferences from the evidence. See *State* v. *Mendez*, supra, 154 Conn. App. 279 (jurors "not required to put aside their common sense" [internal quotation marks omitted]). The jury heard evidence from Edwards, who identified the defendant as the person seen driving the stolen Mercedes prior to the robbery. The jury also witnessed the video surveillance footage taken from the Hartford gas station that showed the stolen Mercedes enter the lot, following a red sport utility vehicle, which was also linked to the robbery. The jury heard testimony from Schroeder, who stated that one day prior to the robbery, she observed the defendant suspiciously walk up to the front door of the jewelry store at about closing time and then return to the parking lot where he entered the Mercedes. Moreover, on the day of the robbery, the Mercedes was found

abandoned in a parking lot near the jewelry store. From this evidence, the jury could have reasonably inferred that the defendant used the Mercedes to monitor the store and plan the robbery, while also concealing his identity. See *State* v. *Miller*, 59 Conn. App. 406, 413–14, 757 A.2d 69 (2000) (monitoring store prior to robbery constituted overt act in furtherance of crime), cert. denied, 255 Conn. 942, 769 A.2d 60 (2001).

## II

The defendant next claims that the court committed harmful error by consolidating, and then subsequently denying his motions to sever, the Madison and Ellington cases. The defendant argues that joinder of the Madison and Ellington charges resulted in substantial prejudice in two respects. First, the defendant asserts that factual similarities in the two cases impaired the jury's ability to consider the evidence in each case independently. Second, the defendant argues that the length and complexity of the trial "enhanced the likelihood that the jury would confuse or blend the evidence, weighing it cumulatively, rather than independently." The state responds by claiming that the cases did not involve overly similar facts and that the trial was not unduly lengthy or complex. We agree with the state.

The following procedural history is relevant. On January 18, 2012, the state filed a motion for joinder, pursuant to Practice Book § 41-19,[5] of the Madison and Ellington charges. The state further requested, pursuant to Practice Book § 41-23,[6] that the joint trial be conducted in the Tolland judicial district. The defendant objected to the motion to join and filed a separate motion to sever, arguing that joinder would be improper and prejudicial to him. After a hearing, the court concluded that the state had met its burden of establishing the absence of the three types of prejudice discussed in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), that can result from the joinder of cases. In its memorandum of decision, the court set forth the three *Boscarino* factors: first, whether the charges pertain to easily distinguishable and discrete factual scenarios that are unlikely to confuse the jury; second, whether the cases involve allegations of criminal conduct of such a violent or shocking nature that it is likely to stir the emotions of the jurors; and third, that joinder would result in a long and overly complex trial where there is a risk of jury confusion. The court concluded that the state had met its burden of establishing the absence of substantial prejudice set out in *Boscarino* and therefore granted the state's motion for joinder and denied the defendant's motion for severance.

During the trial, the court, *Mullarkey, J.*, repeatedly instructed the jury that it should consider each incident separately. The court provided a preliminary charge that the jury "must not infer that [the defendant] did anything wrong simply because there are two separate

cases being tried at the same time." During the trial, the court provided several cautionary instructions directing the jury to consider the evidence of each incident separately. Each of the exhibits were marked either "M" for Madison or "E" for Ellington. The state and the defense rested their cases in regard to the Madison charges before the state began to present evidence on the Ellington charges. Finally, the court instructed the jury that it must deliberate and reach a verdict on the Madison charges before it could begin deliberation on the Ellington charges.

The following legal principles guide our resolution of the defendant's claim. "We have recognized the benefits of joining two criminal cases involving the same defendant. A joint trial expedites the administration of justice, reduces congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who otherwise would be called to testify only once. . . . Courts and commentators, however, have long recognized the tension between these advantages and the defendant's right to a fair trial." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Perez*, 147 Conn. App. 53, 94–95, 80 A.3d 103 (2013) (*Lavine, J.*, concurring), cert. granted on other grounds, 311 Conn. 920, 86 A.3d 468 (2014).

We review the court's decision to join or sever offenses under the abuse of discretion standard. *State* v. *Ellis*, 270 Conn. 337, 375, 852 A.2d 676 (2004). Our General Statutes provide the basis for the trial court to join or sever criminal charges: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." General Statutes § 54-57; see also Practice Book § 41-19. "[W]hen charges are set forth in separate informations . . . and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19.[7] The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors." (Footnote altered.) *State* v. *Payne*, 303 Conn. 538, 549–50, 34 A.3d 370 (2012).

On appeal, a defendant challenging the court's joinder of multiple charges "must demonstrate that the denial of severance resulted in substantial injustice, and also that any resulting prejudice was beyond the curative power of the court's instructions. . . . Our Supreme Court has determined that [w]here evidence of one incident *can* be admitted at the trial of the other, sepa-

rate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Carty*, 100 Conn. App. 40, 45–46, 916 A.2d 852, cert. denied, 282 Conn. 917, 925 A.2d 1100 (2007). Mindful of these legal principles, we now turn to the defendant's various claims.

A

We first consider the first *Boscarino* factor, which is that the two cases involve discrete, easily distinguishable factual scenarios. *State* v. *Boscarino*, supra, 204 Conn. 722–23. The defendant argues that the two cases contained "sufficient similarities so as to raise the significant risk that the jury would improperly consider the other crime evidence as propensity evidence." The state argues that, under the first factor of *Boscarino*, the defendant's claim fails because the two cases involved discrete and easily distinguishable factual scenarios. We agree with the state.

In its memorandum of decision, the court determined that the Madison and Ellington robberies were factually discrete and easily distinguished. The court determined that "[t]he Madison robbery occurred, according to the claims presented at the hearing on these motions, around noon on a summer day and inside a jewelry store. The victims were ordered to a back room where they were bound with duct tape. The robbers absconded with around $100,000 in merchandise. The Ellington robbery occurred in a parking lot of a jewelry store on a winter evening. That robbery was interrupted by the arrival of a passerby, and the thieves fled without any booty. These two scenarios are clearly distinguishable and uncomplicated. There is little risk that a jury would mistakenly blend the evidence pertaining to one incident with that of the other."

Upon a review of the record, we are not convinced that these cases were so factually similar as to confuse the jury. "Factual scenarios that are discrete and easily distinguishable involve different locations, times and witnesses. . . . Presentation of the evidence in an orderly sequence contributes to the distinguishability of the factual scenarios in the charges joined for trial. . . . The evidence need not be presented in strictly chronological order, however, as long as the presentation does not confuse the jury and does not prejudice it against the defendant." (Citations omitted.) *State* v. *Rodriguez*, 91 Conn. App. 112, 118–19, 881 A.2d 371, cert. denied, 276 Conn. 909, 886 A.2d 423 (2005). Here, although both cases involved robberies, the likelihood that the jury would confuse the two was minimal. One trial stemmed from events in Ellington, the other trial stemmed from events in Madison. The Ellington trial involved a botched robbery where the perpetrators

never entered the store, while the Madison trial involved a completed robbery where the perpetrators bound the store's employees and left with cash and jewelry. There were also no overlapping witnesses or victims. The simple fact that both cases involved robberies where dark clothing, masks, firearms, and duct tape were used is not sufficient to establish that the crimes were indistinguishable. See *State* v. *Fauci*, 87 Conn. App. 150, 157, 160, 865 A.2d 1191 (2005) (court found distinguishable three robberies of fast food restaurants, where perpetrators attempted to break into restaurants by throwing rock through glass door), aff'd, 282 Conn. 23, 917 A.2d 978 (2007); see also *State* v. *Herring*, 210 Conn. 78, 96, 554 A.2d 686 (two killings were factually distinguishable when one victim was killed while fleeing from an attempted robbery, other victim was killed after helping defendant rob bank, and victims were shot in different parts of body and died of wounds to different organs), cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

The defendant further contends that jury confusion likely occurred because of the use of cross admissible evidence. Specifically, the state was allowed to present evidence of use of stolen, out-of-state, drop cars and the use of novelty handcuffs in both the Madison and Ellington cases. The crux of this contention, however, is one regarding the cross admissibility of evidence, rather than a challenge to the court's joinder ruling. In *State* v. *King*, 35 Conn. App. 781, 791–93, 647 A.2d 25 (1994), aff'd, 235 Conn. 402, 665 A.2d 897 (1995), this court concluded that joinder was appropriate where, although evidence as to each of the separate robberies was cross admissible, the charges were predicated on distinct fact patterns. In *King*, the defendant was charged with five distinct counts of robbery. Id., 792–93. The trial court ruled that the evidence was cross admissible in order to establish the defendant's identity and common scheme. Id., 791. Despite the similarities of the various charges, this court affirmed the trial court's conclusion that joinder was proper because each robbery was based on "specific, easily distinguishable facts." Id., 792. Thus, the proper inquiry is not whether the evidence is, or is not, cross admissible, but rather whether the facts are so indistinguishable as to be confusing to the jury.[8] Because these two cases were factually and temporally distinct, we conclude that the trial court did not abuse its discretion with respect to its conclusion regarding the first *Boscarino* factor.

B

We now turn to the next *Boscarino* factor, which pertains to the duration and complexity of the trial. This factor pertains to the concern, as stated in *State* v. *Boscarino*, supra, 204 Conn. 724, that in long, complicated trials it is "highly likely that the jury might confuse the evidence in separate cases."

In *Boscarino*, our Supreme Court concluded that the trial was complex when it lasted ten weeks, included testimony from fifty-five witnesses, and involved sixty-six exhibits. Id., 723–24. Although there is no specific standard in determining what constitutes an overly long and complex trial, a review of our case law is instructive. The following joined trials were not considered overly complex: *State* v. *Payne*, supra, 303 Conn. 552 (trial lasted two weeks and consisted of eight days of testimony and twenty-one witnesses); *State* v. *Atkinson*, 235 Conn. 748, 766, 670 A.2d 276 (1996) (entire trial lasted five days and consisted of fifteen witnesses); *State* v. *Jennings*, 216 Conn. 647, 659–60, 583 A.2d 915 (1990) (jury heard testimony from fourteen witnesses over five days and considered twenty-eight exhibits); *State* v. *Herring*, supra, 210 Conn. 97 (jury heard eight days of testimony from twenty-three witnesses). In the present case, the trial lasted eighteen days, involved forty-seven witnesses, and involved more than 400 exhibits. The state presented the Madison evidence first, followed by the Ellington evidence. On the basis of such a procedural history, we cannot conclude that joinder resulted in a complex trial that confused the jury and thereby prejudiced the defendant.

Furthermore, the trial itself was not overly complex and the issues presented were straightforward. The primary issue at trial was whether the defendant was properly identified as the perpetrator of the alleged crimes. Accordingly, although there were forty-seven witnesses, the testimony focused primarily on the discrete issue of identification. Further, the vast majority of the exhibits were photographs of the two crime scenes. A review of this photographic evidence confirms that many of photographs show the same image at various angles. Although the trial was complex in that it required the jury to draw reasonable inferences from circumstantial evidence, this alone does not satisfy the second *Boscarino* factor. *State* v. *Delgado*, 243 Conn. 523, 537, 707 A.2d 1 (1998). Moreover, the fact that the jury found the defendant not guilty of the Ellington charges further established its ability to consider each incident separately. We therefore conclude that neither the length of the trial, nor the nature of the issues presented created a likelihood of jury confusion.

### III

The defendant next claims that the court erred when it ruled that two categories of evidence were cross admissible. Specifically, the defendant argues that the court improperly concluded that the use of novelty handcuffs and the use of stolen out-of-state vehicles in both crimes were signature in nature and therefore cross admissible in both trials. The defendant further alleges that, under our case law, partial cross admissibility is not permissible and, as a result, the court committed harmful error due to the overall weak nature of

the state's case. The state argues that, although the defendant is correct that cross admissibility rulings apply to the entirety of the prior misconduct, rather than mere pieces of evidence, a proper ruling would have allowed all evidence to be cross admissible. Thus, the state contends that the court's unduly restrictive ruling benefited the defendant and, therefore, cannot not be considered harmful on appeal. We conclude that the court's evidentiary rulings were proper; however, we disagree with both parties' assertion that the trial court was required, upon a finding that the evidence was signature, to admit all evidence of the prior misconduct.

On May 9, 2012, the state filed a notification of its intent to offer evidence of the defendant's prior misconduct. Specifically, the state requested, pursuant to § 4-5 (b) of the Connecticut Code of Evidence, that the court order that "each of the above captioned cases be admissible in the other as relevant to identity, common plan or scheme, signature crime, a system of criminal activity, and to the corroboration of crucial prosecution testimony." The defendant filed an objection to the state's offer on May 18, 2012, arguing that the Madison and Ellington crimes were not signature crimes under our law and that even if the conduct was signature, the evidence was still inadmissible on the ground that it was more prejudicial than probative. On May 21, 2012, the court heard argument on the issue, where both parties presented the similarities and differences between the two criminal acts. On June 8, 2012, the court concluded that "in a limited way, this is a signature case. . . . [W]hile . . . these two robberies bear a lot of similarities, the only two areas in which I find they are signature . . . are in the employment of these handcuffs and the use of the . . . stolen out-of-state drop cars. And that's my ruling."

We begin our analysis by noting that earlier in this opinion, we concluded that the court properly granted joinder on the ground that the state had satisfied its burden of establishing that the defendant would not be unfairly prejudiced in light of the *Boscarino* factors. Thus, the state was not required to also establish the cross admissibility of the Madison and Ellington conduct during the joinder hearing. See *State* v. *Payne*, supra, 303 Conn. 550 (joinder may be granted after state establishes, by preponderance of evidence, "either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors"). As the state chose to meet its burden by establishing the absence of the *Boscarino* factors, the court did not consider the issue of cross admissibility in its ruling on joinder. As a result, the court's later determinations on cross admissibility were purely evidentiary rulings and we review them as such.

"[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the

crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . ." Conn. Code Evid. § 4-5 (a). Under § 4-5 (b) of the Connecticut Code of Evidence, however, evidence of prior misconduct may be admitted when it is offered for a purpose other than to establish the defendant's bad character or criminal propensity. Among other things, prior misconduct evidence may be admissible to prove intent, identity, motive, malice or a common plan or scheme. Conn. Code Evid. § 4-5 (b). Thus, the fact [t]hat evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . . In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 630, 930 A.2d 628 (2007).

When misconduct evidence is offered to establish a common plan or scheme, our case law requires that the "two crimes [be] sufficiently similar and unique to warrant a reasonable inference that the defendant committed both crimes." *State* v. *Randolph*, 284 Conn. 328, 350, 933 A.2d 1158 (2007). Courts are thus required to conduct a test to determine whether the similarities between the charged crime and the other misconduct are such that it rises to the level of being signature in nature. Id., 352. Accordingly, under *Randolph*, it is the state's burden to "produce sufficient evidence to: (1) establish the existence of a signature, modus operandi, or logo *and* (2) support a permissive inference that both crimes were related to an overall goal in the defendant's mind." (Emphasis in original; internal quotation marks omitted.) Id., 355.

"We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). Our review of the trial transcript reveals that, in making its determination, the court properly applied the law. The court considered the direct connections between the Madison and Ellington crimes and concluded that in many ways, the robberies were typical and not signature in nature. The court, however, did find that the use of novelty handcuffs and stolen out-of-state vehicles did rise to the level of being signature in nature. After considering the various ways in which admission of this evidence could be prejudicial, including the three *Boscarino* factors, the court determined that the probative value of the evidence outweighed its prejudicial value.

The defendant argues that the court was required to

rule that either the entirety of the misconduct evidence was or was not cross admissible and, thus, was precluded from finding only some of the prior misconduct evidence to be cross admissible. We do not agree. Although we note that our Supreme Court in *Randolph* held that prior misconduct with signature characteristics may be admissible *in its entirety*, our trial courts retain the discretion to appropriately narrow their evidentiary rulings to comport with the rules of evidence. Conn. Code Evid. § 1-4 ("[t]he court may, and upon request shall, restrict the evidence to its proper scope"). In the present case, the court determined that there were signature elements connecting the two crimes, thereby meeting the signature test under *Randolph*. The *Randolph* test, however, goes only so far as establishing what constitutes signature evidence, which may be admissible under the common plan exception in § 4-5 (b) of the evidence code. In order to determine admissibility, the court must also, as it did here, conduct an inquiry into whether the evidence is more probative than prejudicial. See Conn. Code Evid. § 4-5 (b), commentary. Upon this basis, the court ruled that only the evidence directly related to the signature elements of the two crimes, rather than all of the misconduct evidence, would be cross admissible. Due to the difficulty inherent in balancing the probative and prejudicial value of evidence, we review these decisions while making every reasonable presumption in favor of the trial court's ruling. See *State* v. *Merriam*, 264 Conn. 617, 661, 835 A.2d 895 (2003). Accordingly, we reject the defendant's claim that the court improperly ruled on the cross admissibility of evidence.

IV

The defendant next claims that the court erred when it provided instructions that allowed the jury to consider two areas of evidence as cross admissible. Specifically, the defendant contends that because the court improperly joined the two trials and improperly cross admitted evidence, the court's instruction regarding cross admissibility amounted to harmful error. This, however, is not a distinct claim on appeal, but rather derivative of the defendant's two previous claims. As we have concluded that the court's joinder and evidentiary rulings were not improper, this claim must also fail.

V

The defendant last claims that the court committed harmful instructional error when it denied his request to charge the jury on the reliability of eyewitness testimony and DNA evidence. We are not persuaded.

We begin by setting forth the appropriate standard of review. The defendant urges that errors involving identification instructions are of a constitutional magnitude. In support of this proposition, he cites *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995), where

the Supreme Court stated that "an improper instruction on an element of an offense . . . is of constitutional dimension"; (internal quotation marks omitted); and *State* v. *Jackson*, 37 Conn. App. 491, 499, 656 A.2d 1056 (1995), rev'd, 239 Conn. 629, 687 A.2d 485 (1997), which held that "[i]dentity of a defendant . . . is an element common to proof of all crimes . . . ." Although it is true that an instructional error regarding the elements of a crime is constitutional, the defendant here challenges instead an instruction related to the dangers of misidentification. "Our Supreme Court has held that identification instructions are not constitutionally required and [e]ven if [a] court's instructions were less informative on the risks of misidentification . . . the issue is at most one of instructional error rather than constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law. (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Bullock*, 155 Conn. App. 1, 19–20, 107 A.3d 503, cert. denied, 316 Conn. 906, 111 A.3d 882 (2015).

We review nonconstitutional claims of instructional error under the following standard. "While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is . . . reasonably probable for . . . nonconstitutional [improprieties] that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 455, 10 A.3d 942 (2011).

The law regarding eyewitness identification recently was substantially revised in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012). In *Guilbert*, our Supreme Court "overrruled *State* v. *Kemp*, [199 Conn. 473, 507 A.2d 1387 (1986)], and *State* v. *McClendon*, [248 Conn. 572, 730 A.2d 1107 (1999)], to the extent that those cases had indicated that the reliability of eyewitness identifications was a matter within the knowledge of the average juror and that expert testimony on the topic necessarily was unhelpful or would invade the province of a jury." *State* v. *Williams*, 317 Conn. 691, 700–701, 119 A.3d 1194 (2015). The court "disavowed the previously

expressed notions that the factors undermining the reliability of eyewitness testimony were common knowledge and that permitting expert testimony on those factors amounted to an improper invasion of the province of a jury to weigh evidence." Id., 703. At the same time, the court in *Guilbert* emphasized "that [its] decision did not mean that expert testimony necessarily was required in all cases involving eyewitness identifications. Rather . . . trial courts were to retain broad discretion in ruling on the qualifications of expert witnesses and determining whether their opinions are relevant. . . . Consequently, whether to permit expert testimony concerning the reliability of eyewitness identification evidence in any individual case ultimately is a matter within the sound discretion of the trial court." (Internal quotation marks omitted.) Id.

In overruling its past precedent, the court identified several factors "affecting the reliability of eyewitness identifications [that] are either unknown to the average juror or contrary to common assumptions . . . ." *State v. Guilbert*, supra, 306 Conn. 252. Relevant to this appeal, these factors include: "(1) [that] there is at best a weak correlation between a witness' confidence in his or her identification and its accuracy . . . (5) [that] a person's memory diminishes rapidly over a period of hours rather than days or weeks . . . [and] (6) [that] identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure . . . ." (Footnotes omitted.) Id., 237–39.

"Although the defendant in *Guilbert* raised an evidentiary claim, and not a claim of instructional error, the court provided guidance about the proper composition of jury instructions related to the fallibility of eyewitness identification evidence. The court stated: 'We also wish to reiterate that a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions on the fallibility of eyewitness identification evidence . . . would alone be adequate to aid the jury in evaluating the eyewitness identification at issue. We emphasize, however, that any such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case; broad, generalized instructions on eyewitness identifications . . . do not suffice.' The court stated: '[T]he proper approach . . . is to leave the development of any such jury instructions to the sound discretion of our trial courts on a case-by-case basis, subject to appellate review.'

"In its new approach to the admissibility of expert testimony concerning the fallibility of eyewitness identification evidence and in its discussion of jury instructions related to such evidence, our Supreme Court in *Guilbert* undeniably sought to protect defendants from a specific risk, that of being misidentified as perpetra-

tors by eyewitnesses to criminal activity." (Citations omitted; footnote omitted.) *State* v. *Bullock*, supra, 155 Conn. App. 24–25.[9] We now consider the defendant's various instructional claims.

A

The defendant first claims that the court committed error with regard to its instructions on eyewitness testimony. Specifically, the defendant claims that under *State* v. *Guilbert*, supra, 306 Conn. 245, the court was required to provide instructions that would inform the jury of the "weak correlation between a witness' confidence in his or her identification and its accuracy . . . ." Id., 237. We disagree.

The court provided the following instructions regarding the certainty of eyewitness identification evidence: "You may also consider the strength of the identification, including the witness' degree of certainty. Certainty, however, does not mean accuracy." Prior to the charging conference, the defendant requested the following instruction: "While the witness' level of certainty may be considered, bear in mind that certainty does not ensure accuracy; in fact, it is now known that there is little correlation between a witness' degree of certainty and the reliability of the identification."

Although there exists modern science recognizing a weak correlation between an identifying witness' confidence in the identification and its accuracy; *State* v. *Guilbert*, supra, 306 Conn. 253; we conclude that the defendant's request was, in substance, adopted by the court. *State* v. *Fair*, 118 Conn. App. 357, 364–65, 983 A.2d 63 (2009) ("refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance" [internal quotation marks omitted]). Here, the court explained that certainty was a factor in considering the testimony; however, it cautioned the jury not to infer accuracy from the witness' certainty alone. The crux of this instruction was that the jury should be careful not to correlate certainty with accuracy, which was the essence of the defendant's request. The fact that the court did not adopt the defendant's explicit request did not render its instruction improper.[10]

Further, the defendant has not established harm. The defendant argues that the state repeatedly asked the witnesses how certain they were at the time the identifications were made, thereby "intentionally perpetuating [the] myth in order to get a conviction." On this basis, the defendant argues that the instruction was harmful because it did not notify the jury of the lack of a correlation between certainty and accuracy. We are not persuaded. First, our Supreme Court in *Guilbert* recognized the weak correlation between confidence and accuracy, concluding only that the jury should be apprised of this information when considering the relia-

bility of eyewitness testimony. The court did not hold that identification testimony was inadmissible, nor did it state that the jury could not consider the witness' confidence in the identification. Second, we do not review jury instructions in isolation, but instead must consider the challenged instruction in the context of the entire charge. *State* v. *Colon*, 272 Conn. 106, 219, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). The court's charge also included the following statement: "When assessing the credibility or the testimony as it relates to the issue of identification, keep in mind, it's not sufficient that the witness be free from doubt as to the correctness of the identification of the defendant; rather, you must be satisfied beyond a reasonable doubt on the accuracy of the identification of the defendant before you find him guilty on any charge." This instruction further clarified to the jurors that it is their role to determine the accuracy of the identification and that the witness' certainty, even if "free from doubt," is not enough to conclude that the identification is accurate. Thus, the defendant's claim fails to establish harm.

## B

The defendant next challenges the court's failure to provide an instruction that warned the jury that eyewitness identifications become less reliable the longer the period of time between the initial observation and the identification. The state argues that the defendant's request was, in substance, provided in the court's charge to the jury. We agree with the state and conclude that, under the circumstances of this case, the requested instruction was unwarranted.[11]

The following facts are relevant to our resolution of this claim. During the trial, the state relied on eyewitness identifications from Schroeder and Edwards. Each witness was presented with a photographic array, and both identified the defendant as the person they witnessed. When Schroeder made an identification from the photographic array, more than eight months had passed since her observation. Edwards made an identification from the photographic array after twenty-six months had passed since her observation.[12]

At trial, the defendant requested a jury charge that would have instructed the jury as follows: "And lastly, how did the passage of time between the witness' viewing of the suspect and her subsequent identification of him in a police photo array procedure affect its reliability?—as courts have recognized that the more time that goes by, the weaker the reliability of the identification." The court denied the request and ultimately charged the jury in relevant part: "Further, you [should] consider the length of time that's elapsed between the occurrence of the crime and the identification of the defendant by the witness."

We conclude that the court instructed the jury on the substance of the defendant's request. The instruction notified the jury that it should consider the length of time between the witness' observation and the identification. The most reasonable conclusion that can be drawn from this instruction is that as time passes, a person's memory fades and their recollections become less reliable. We see no discernible difference between the substance of the court's charge and the defendant's request.

Further, the defendant's claim does not fall within one of the dangers of eyewitness identifications recognized in *Guilbert*. In *Guilbert*, our Supreme Court recognized that "memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter . . . ."[13] *State v. Guilbert*, supra, 306 Conn. 253–54. The concern in *Guilbert*, however, was not simply that memories fade rapidly, but rather that jurors "commonly are unaware of the effect of . . . the rate at which memory fades . . . ." Id., 242. In the present case, the identifications by Edwards and Schroeder from photographic arrays did not occur within hours or weeks of the initial observation. Edwards identified the defendant after more than two years had passed since the event, and Schroeder identified the defendant after more than three-quarters of a year had passed. In such situations, it is well within the knowledge of the average juror that, as months and years pass, an identification, like any other recollection of fact, may be based on faded memories rather than clear recollection.[14] See, e.g., *Sell v. United States*, 539 U.S. 166, 180, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003) (stating that memories fade "after years"); *United States v. Horton*, 270 Fed. Appx. 783, 788 (11th Cir. 2008) (trial court did not abuse discretion in declining to deliver instruction requested by defendant because its substance was included in court's charge, and "[t]he jury knew the events had occurred . . . years before and that memory fades with the passage of time"); *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) (trial court did not abuse discretion in declining request for public funds to hire expert on eyewitness identification in case where eyewitness identifications "were not made until several months after the robberies" because "[i]t is common knowledge that memory fades with time"), cert. denied, 519 U.S. 1140, 117 S. Ct. 1013, 136 L. Ed. 2d 890 (1997); *State Industrial Ins. System v. Jesch*, 101 Nev. 690, 694, 709 P.2d 172 (1985) (noting "the likelihood of error or fraud that may occur when evaluating factual matters occurring many years before" because memories fade). As the purpose of a cautionary instruction, under *Guilbert*, is to notify the jury of established science that is contrary to common assumptions and not within the knowledge of the average juror, we cannot conclude that such an instruction was necessary in the present

case.[15]

Even if we assume arguendo that the court committed instructional error, the defendant would still be required to establish harm. "When a defendant challenges the trial court's failure to provide a requested charge . . . [where] the error is merely of an evidentiary nature . . . the defendant must prove that it was reasonably probable that the jury was misled. (Citation omitted.) *State* v. *Ali*, 233 Conn. 403, 422–23, 660 A.2d 337 (1995). "Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 559.

In reviewing the defendant's claim, we conclude that he has not carried his burden of establishing harm. At trial, defense counsel cross-examined both Schroeder and Edwards on the accuracy of their identifications, given the amount of time between their observations and their identifications. At closing argument, defense counsel argued that the identifications were not credible, given the passage of time, and referred the jury to the court's instruction regarding eyewitness identifications. See *State* v. *Payne*, supra, 303 Conn. 552–53 (harmless error where improper joinder of cases did not substantially sway verdict). Additionally, the cumulative force of the other evidence at trial, especially the DNA evidence recovered from the ends of duct tape used to bind the arms and legs of the victims of the Madison robbery, was independently sufficient to identify the defendant as one of the actors in the robbery. See *State* v. *Randolph*, supra, 284 Conn. 376–80 (admission of medical examiner's report harmless when other ample evidence supported trial court's probable cause determination).

C

The defendant next claims that the court improperly declined to give the jury his requested instruction regarding DNA evidence presented by the state. Specifically, the defendant argues that the court's instructions must reflect relevant accepted science and social science. By denying the request to charge, the defendant contends, the court improperly instructed the jury on how to consider the DNA evidence. We disagree.

The defendant sought the following charge related to DNA evidence: "You have heard evidence from an analyst at the state laboratory who testified about her testing of various pieces of evidence that were submitted for DNA analysis. While DNA analysis can be a powerful tool in the area of law enforcement, its forensic application is not a perfect science. Crime scene DNA samples often do not come from a single source obtained in immaculate conditions; they are sometimes messy assortments of multiple unknown persons often

collected in less than ideal conditions. These samples can be of poor or degraded quality, or they can be of minimal or insufficient quantity, especially as investigators seek profiles from a few cells retrieved from swabbings of various items such as cigarette butts, envelopes or soda cans, pushing the limits of DNA technology. All of these factors make DNA testing in the forensic context far more complex tha[n] simply reporting test results; accordingly, the circumstances surrounding the testing of the DNA samples, as well as the testing itself, must be carefully scrutinized." The court denied the request, stating that the proposed charge requested the court to "comment on [DNA] evidence in ways that samples can be poor, degraded quality, minimal or insufficient." The court then explained to defense counsel that these topics, if a factual basis existed, could be more appropriately raised during closing arguments.

The defendant cites *State* v. *Guilbert*, supra, 306 Conn. 218, and *State* v. *Ledbetter*, 275 Conn. 534, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), for the proposition that "instructions must reflect relevant accepted science and social science." The defendant, however, provides no support that his assertions regarding the unreliability of DNA evidence are *accepted science*. In *Guilbert*, our Supreme Court recognized "the broad based judicial recognition [that] tracks a *near perfect consensus.* . . . The extensive and comprehensive scientific research, as reflected in hundreds of peer reviewed studies and meta-analyses, *convincingly demonstrates* the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification." (Emphasis added; footnotes omitted.) *State* v. *Guilbert*, supra, 234–36. The court in *Guilbert* was concerned with the narrow issue of eyewitness identifications and provided no discussion of DNA evidence. In the present case, the defendant points to no evidence, nor did he present any during the trial, that supports the proposition that the scientific community has identified and wholly adopted the various ways in which DNA evidence may be fallible. Thus, the court correctly determined that the defendant's position was better left for closing arguments, rather than the jury charge. See *State* v. *Berger*, 249 Conn. 218, 240–41, 733 A.2d 156 (1999) (court has duty to submit to jury no issue upon which evidence would not reasonably support finding).[16]

The judgment is affirmed.

In this opinion KELLER, J., concurred.

[1] The substitute information from July 11, 2012, charged the defendant with the following, in relevant part: Count one charged the defendant with conspiracy to commit robbery in the first degree. Counts two through six charged the defendant with five counts of kidnapping in the first degree with a firearm; count seven charged the defendant with robbery in the first degree, count eight charged the defendant with larceny in the first degree, and count nine charged the defendant with commission of a class A, B or C felony with a firearm.

[2] Prior to sentencing, the court denied the defendant's motion for a new trial.

[3] *Golding* held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. In *In re Yasiel R.*, 317 Conn. 773, 781,      A.3d      (2015), our Supreme Court modified *Golding*'s third prong by eliminating the requirement that the constitutional violation be clearly demonstrated by an appellant.

[4] Lirot testified that, although he saw only one of the perpetrators, he heard two separate voices. He testified that the first man had a gun and stayed with the victims, while the second man moved throughout the other rooms in the store. Lirot heard the second man demanding to know where the store cashbox was located.

[5] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

[6] Practice Book § 41-23 provides in relevant part: "Upon motion of the prosecuting authority or the defendant, or upon its own motion, the judicial authority may order that any pending criminal matter be transferred to any other court location . . . (3) Where the joint trial of informations is ordered pursuant to Section 41-19 and the cases are pending in different judicial districts or geographic areas."

[7] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

[8] We recognize that the defendant's argument regarding cross admissibility is more appropriately framed as an evidentiary challenge, which is his third claim. See part III of this opinion.

[9] At the time of trial, *Guilbert* was pending before our Supreme Court. The Supreme Court, in deciding *Guilbert*, cited approvingly to the New Jersey Supreme Court in *State* v. *Henderson*, 208 N.J. 208, 296, 27 A.3d 872 (2011). See *State* v. *Guilbert*, supra, 306 Conn. 236–37. It is important to note that although the court in *Henderson* revised the framework with regard to jury instructions on eyewitness testimony, the court went on to conclude that this new standard would not be applied retroactively. *State* v. *Henderson*, supra, 302. In our state, however, we follow the " general rule that judgments that are not by their terms limited to prospective application are presumed to apply retroactively . . . to cases that are pending . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 454.

[10] In concluding that the court committed instructional error, the concurrence states that the court exacerbated the impropriety by instructing the jury that it "may also consider the strength of the identification, including the witness' degree of certainty." We note, however, that the defendant's requested instruction included the following language: "the witness' level of certainty may be considered." Thus, any claimed error that is based on this language would constitute error induced by the defendant and not impropriety by the court. See *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004) (induced error defined as "[a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling" [internal quotation marks omitted]).

[11] The concurring opinion posits that we have created an assumption that memories fade as months and years pass, and did so without any scientific support. We disagree with that characterization and conclude that, in the absence of scientific evidence furnished by a defendant that conclusively establishes a danger inherent to eyewitness identification evidence that is contrary to the common knowledge of jurors, a trial court is not compelled to provide an instruction thereon.

Significantly, our Supreme Court in *Guilbert* emphasized that "a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions" on eyewitness testimony are warranted. *State* v. *Guilbert*, supra, 306 Conn.

257–58. In reviewing the discretionary determinations of a trial court, "every reasonable presumption should be given *in favor of the correctness of the court's ruling*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Williams*, supra, 317 Conn. 710 n.17. Accordingly, the court's determination regarding the extent to which it was appropriate to include a focused and specific eyewitness instruction should be reviewed for an abuse of discretion.

Our Supreme Court in *Guilbert* identified eight specific variables that impact eyewitness identifications; see *State* v. *Guilbert*, supra, 306 Conn. 253–54; and were recognized by other courts, and track "a near perfect scientific consensus." Id., 234–35. Although one of these variable involves the rate at which memory deteriorates, nowhere does the court assert that jurors misunderstand that memory does, in fact, deteriorate. This, however, does not end our inquiry. The court in *Guilbert* stated that "the foregoing eight variables are not exclusive. . . . [T]rial courts [should not be limited] from reviewing evolving, substantial, and generally accepted scientific research. But . . . they must *rely on reliable scientific evidence* that is generally accepted by experts in the community." (Emphasis added; internal quotation marks omitted.) Id., 258.

In the present case, the defendant cited only *State* v. *Artis*, 136 Conn. App. 568, 607, 47 A.3d 419 (2012), rev'd, 314 Conn. 131, 101 A.3d 915 (2014), for the proposition that as months and years pass, the reliability of an identification weakens. The defendant, however, provided no support establishing that this is unknown or contrary to the common knowledge of jurors. See *State* v. *Williams*, supra, 317 Conn. 710 n.17 (axiomatic that defendant bears burden of furnishing evidentiary record to demonstrate that court abused discretion). As a result, there was no scientific evidence before the court that supported the defendant's requested instruction. Because *Guilbert* recognized the need for cautionary instruction only when the dangers of misidentification were well established by science *and* unknown or contrary to the jury's understanding, it would be inappropriate for a court to tailor such an instruction in the absence of such evidence. Accordingly, we cannot conclude that the court abused its discretion when it refused to give the requested instruction in the present case.

[12] We further note that both witnesses' observations were made prior to, not during, the criminal incident and thus were made under less stressful circumstances.

[13] Our Supreme Court in *State* v. *Guilbert*, supra, 306 Conn. 236–37, cited approvingly to modern scientific research on eyewitness identifications identified in *State* v. *Henderson*, 208 N.J. 208, 27 A.3d 872 (2011). In *Henderson*, the New Jersey Supreme Court stated that research on human memory indicates that "memory rapidly and continuously decays . . . ." (Internal quotation marks omitted.) Id., 246.

[14] Upon concluding that the specific dangers recognized in *Guilbert* are inapplicable to the present case, we follow the established precedent that "expert testimony on eyewitness identification . . . in most cases, deals with general principles, such as the fact that memories fade over time . . . . Obviously there are aspects of these general principles on which experts might make some contribution in particular cases. However, juries are not without a general understanding of these principles and . . . they see the possible application of these principles in concrete circumstances. The jury [must] have the opportunity to assess the witnesses' credibility on the basis of what is presented at trial and not solely on general principles." (Internal quotation marks omitted.) *State* v. *McClendon*, supra, 248 Conn. 589–90 (quoting *Commonwealth* v. *Francis*, 390 Mass. 89, 101, 453 N.E.2d 1204 [1983]). Accordingly, the defendant's requested instruction, under these circumstances, would likely have "invade[d] the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony." (Internal quotation marks omitted.) *State* v. *Kemp*, supra, 199 Conn. 477.

[15] The concurrence states that we misread *Guilbert*. Respectfully, we do not believe *Guilbert* is as restrictive as the concurrence suggests. *Guilbert* expressly held that "whether to permit expert testimony concerning the reliability of eyewitness identification evidence in any individual case ultimately is a matter within the sound discretion of the trial court. . . . [T]he trial court may preclude such testimony if the court reasonably determines, upon due consideration of the facts and circumstances of the case, that the particular issue presented is not beyond the ken of the average juror . . . ." *State* v. *Guilbert*, supra, 306 Conn. 257. *Guilbert* also recognized that "a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions" on eyewitness testimony are appropriate. Id., 257–58. Only recently, our Supreme Court further emphasized the discretion afforded to a trial court

in addressing a disputed eyewitness identification, stating that because "*Guilbert* makes it abundantly clear that trial courts retain the discretion to admit or preclude expert testimony on eyewitness identifications, depending on the particular facts and circumstances of the case . . . we reject the defendant's contention that *Guilbert* instead held that such expert testimony presumptively is admissible in any case involving a disputed eyewitness identification." (Citation omitted.) *State* v. *Williams*, supra, 317 Conn. 704 n.12.

In addition, we note that "the science" of any field should not be the exclusive consideration of the court, nor did *Guilbert* so hold. See *State* v. *Guilbert*, supra, 306 Conn. 257. Not unlike eyewitness identifications, social science research itself is fallible. See, e.g., B. Carey, "Many Psychology Findings Not as Strong as Claimed, Study Says," The New York Times, August 27, 2015, available at http://www.nytimes.com/2015/08/28/science/many-social-science-findings-not-as-strong-as-claimed-study-says.html? r= 0 (last accessed October 27, 2015) (noting that "[t]he past several years have been bruising ones for the credibility of the social sciences").

[16] In support of his claim on appeal, the defendant cites only to a concurrence written by Justice Alito in *District Attorney's Office* v. *Osborne*, 557 U.S. 52, 79–85, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009), which stated that DNA evidence "often fails to provide absolute proof of anything." (Internal quotation marks omitted.) Id., 80–81. Justice Alito, however, also acknowledged that "DNA testing often produces highly reliable results." Id., 80. Thus, the defendant has not established that his DNA concerns track the same "near consensus" in the scientific community as the dangers of eyewitness identifications discussed in *Guilbert*.